EXHIBIT 5

### IN THE UNITED STATES DISTRICT COURT
### FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **P&P Imports LLC, a California limited liability company** | |
| **Plaintiff,** | **Case No.: 8:19-cv-00523-DOC-JDE** |
| **v.** | **Hon. David O. Carter** |
| **Johnson Enterprises LLC, a Virginia limited liability company DBA Tailgating Pros; and Does 1 through 10, inclusive,** | |
| **Defendants.** | |

### EXPERT REPORT OF ROBERT WALLACE

**April 30, 2020**

Expert Report of Robert Wallace

## Table Of Contents

I.      Introduction ................................................................................................................. 1

    A.      Summary Of Qualifications ............................................................................. 2

    B.      Investigation Performed .................................................................................. 2

    C.      Compensation .................................................................................................. 3

    D.      Previous Testimony And Expert Opinions ...................................................... 3

II.     Case Summary ............................................................................................................ 4

III.    Established Practices in Creating Meaningfully Distinctive Trade Dress ................... 6

IV.     Secondary Meaning of Plaintiff's Trade Dress in the GoSports Four in a Row Game ..... 13

    A.      Consumer Perception ..................................................................................... 13

    B.      Advertisement ................................................................................................ 13

    C.      Demonstrated Utility ..................................................................................... 16

    D.      Extent of Use .................................................................................................. 16

    E.      Exclusivity ..................................................................................................... 17

    F.      Copying .......................................................................................................... 17

    G.      Actual Confusion ........................................................................................... 19

    H.      Knowledge of Plaintiff's Success ................................................................. 19

V.      Likelihood of Confusion .......................................................................................... 21

    A.      Strength of the Plaintiff's Trade Dress ......................................................... 21

    B.      Proximity of goods ........................................................................................ 22

    C.      Similarity of the Trade Dress ........................................................................ 23

    D.      Evidence of Actual Confusion ....................................................................... 24

    E.      Marketing Channels Used .............................................................................. 24

    F.      Type of goods and the degree of care likely to be exercised by the purchaser .............. 24

    G.      Defendant's intent in selecting the mark ...................................................... 25

    H.      Likelihood of expansion of the product lines ............................................... 27

VI.     Survey Methodologies: Secondary Meaning Survey ................................................ 28

VII.    Likelihood of Confusion Surveys ............................................................................. 31

    A.      Study Population ............................................................................................ 34

    B.      Survey Fielding and Data Collection ............................................................ 34

**Expert Report of Robert Wallace**

C.      Accuracy of Results ........................................................................................ 35

D.      Bias Management and Extracting Nonsensical Answers ............................... 35

E.      Secondary Meaning Results & Analysis........................................................ 37

F.      Likelihood of Confusion Results & Analysis ................................................ 38

G.      Control Set Results and Net Confusion Scores............................................. 41

H.      Open ended responses indicate the similarity of the trade dress is what drives the likelihood of confusion ............................................................................................. 44

I.      Evidence of Actual Confusion ...................................................................... 45

J.      Confusion has led to brand dilution of the Plaintiff's brand......................... 45

VIII.   Conclusion............................................................................................................ 46

IX.     APPENDIX 1: INFORMATION REVIEWED.................................................... 49

X.      APPENDIX 2: SURVEYS AND RESULTS AS SEPARATE DOCUMENTS ............. 50

XI.     APPENDIX 3: CURRICULUM VITAE ............................................................. 51

XII.    APPENDIX 4: CASES IN THE LAST FOUR YEARS ...................................... 53

XIII.   APPENDIX 5: PUBLISHED WORKS WITHIN THE LAST 10 YEARS..................... 56

**Expert Report of Robert Wallace**

## I.     Introduction

I, Robert Wallace, was engaged by P&P Imports, LLC of Irvine, CA to provide my expert opinion in the matter of P&P Imports, LLC (hereafter referred to as the Plaintiff), who sells a GoSports branded giant 4 In A Row game (hereafter referred to as GoSports game or Plaintiff's game) versus Johnson, Inc. (hereafter referred to as the Defendant), who sells a Tailgate Pros branded giant Four In A Row (hereafter referred to as Johnson game or Defendant's game). These products are hereafter referred to as the products in question.

More specifically I was asked to I was asked to analyze, from the brand identity design industry's point of view, the trade dress of the products in question and to determine two primary factors:

1) If the pre-established GoSports brand's trade dress has acquired secondary meaning, or if the general consuming public recognizes this product as coming from a single source, and

2) If consumers might confuse the products in question as being the same product or products from the same source or affiliated sources so as to determine a likelihood of confusion among the general consuming public between the products in question.

As part of this analysis, I performed three independent surveys based on protocols used and accepted by experts in the industry. The first survey was designed to confirm if the trade dress used on the GoSports game has acquired secondary meaning. The second two surveys were designed to determine if there is a likelihood of confusion between the Plaintiff's game and the Defendant's game among the general consuming public. I also reviewed evidence of actual confusion that further and independently confirm my opinions.

I was also asked to provide an opinion on the parties' actions in creating the trade dress for the products in question and if these actions comply with the accepted practices of the brand identity industry so as to determine if the Defendant's actions show intent to benefit from the Plaintiff's brand identity and trade dress.

Lastly, I was also asked to provide my opinion if any consumer confusion caused by the Defendant might have any negative impact or brand dilution of the Plaintiff's brand.

Generally, my opinions as set forth herein are based on the information provided to me, the three survey findings, and my over 35 years of brand identity and brand messaging experience for a large number of leading consumer product companies and their brands.

This report constitutes my preliminary findings. I reserve the right to supplement my opinions based on this report and any additional information that may affect the outcome of my work or provide greater insight into the matters examined.

1

**Expert Report of Robert Wallace**

### A.        Summary Of Qualifications

I was the Managing Partner for more than 30 years of one of the branding industry's most accomplished and respected brand identity strategy and package design firms, Wallace Church & Co. I am currently the Managing Partner of Best of Breed Branding Consortium, an omni-channel branding consultancy that also focuses on the brand identity and design issues involved in this case. Based on this experience, I have highly specialized knowledge of how marketers create and establish brand identities, how consumers interpret brand identities and messaging, how quickly brand identities can be established, how they develop awareness and perceptions of brands and all the other branding-related issues in this case.

As outlined in my Curriculum Vitae, in Appendix 3 of this report, I have been actively involved in hundreds of brand identity and product and package design assignments for dozens of consumer product companies and hundreds of brands, including Coca-Cola, Procter & Gamble, Unilever, Johnson & Johnson, Target, Pepsico, Pfizer, Kraft, Nestle, Anheuser-Bush, Heinz, The Home Depot, and more than 100 additional national and global brand owners.

Of specific relevance to this report, my firm and I were involved in designing numerous brand identities for Mattel, Hasbro, Pressman, and several others of the game and toy industry's largest and most recognized global firms. This expertise and experience gives me specialized knowledge to analyze the trade dress of the products in question.

As part of my experience, I have participated in creating, fielding and/or analyzing well more than a thousand consumer surveys and research projects. As a result, I have extensive knowledge of how brand identity affects consumer perceptions, how brand identity shapes consumer perceptions and relationships with brands, and how brand identity drives consumer engagement, impacts purchasing, and builds brand trust.

Regarding my expertise in determining the impact of trade dress on brand value and sales, I served on the Board of Directors of The Design Management Institute, the largest global organization in the brand identity design and communications industry, for 10 years. There I co-chaired the Design Value Project, which focused on determining the return on investment of brand identity and its specific impact on sales. I have delivered keynote presentations and have spoken at more than 50 branding industry symposia across the U.S., Europe, Latin America and Asia on this and related brand identity topics. I have authored a number of peer reviewed articles, co-authored a book on brand identity, and lectured at the graduate level of The Columbia School of Business, The SVA Masters in Branding Program, Georgetown University, University of Texas, Seton Hall, and other educational institutions on the impact of brand identity on generating sales.

### B.        Investigation Performed

I have received and reviewed the documents outlined in Appendix 1 of this report as well as anything specifically referenced in this report.

2

**Expert Report of Robert Wallace**

Further, I designed and oversaw the fielding of three independent surveys, including a secondary meaning survey and two likelihood of confusion surveys as part of this engagement. The screeners/questionnaires and the raw and tabulated data results are attached as separate documents to this report as outlined in Appendix 2.

In addition, I also interviewed Peter Engler and Peter Tanoury, the owners of P&P Imports LLC.

### C.        Compensation

I am being compensated in connection with my engagement in this proceeding at the rate of $400 per hour for survey design and report writing and $500 per hour for deposition and trial testimony, plus reimbursement of travel expenses. I have received no additional compensation for my work in this proceeding. My compensation is in no way dependent upon the outcome of this proceeding.

### D.        Previous Testimony And Expert Opinions

I am an acknowledged expert witness in the United States Federal Court System having served on more than 65 cases concerning intellectual property infringement, trademark and trade dress infringement, marketing research, false or deceptive advertising / brand messaging, and other marketing/branding industry issues. In such capacity, I have designed and conducted court-compliant surveys for many of these cases. I have been deposed and/or testified in court as an expert witness approximately 40 times. My substantial experience in branding, marketing and survey development provides me with the background necessary to prepare and analyze the surveys described in this report. A listing of recent cases in which I was engaged as an expert witness is attached as Appendix 4 of this report.

Expert Report of Robert Wallace

## II.    Case Summary

The actions of both parties have been well established as part of this litigation. The focus of this report is to determine if the general consuming public confirms that the GoSports trade dress has achieved secondary meaning and if there is a likelihood of consumers confusing the products in question as being the same or from the same or related sources.

It is my understanding that trade dress may include features such as shape, color, color combinations, texture graphics or other elements, and that to recover for trade dress infringement a plaintiff must show that its trade dress is protectable (i.e., that it is nonfunctional and distinctive) and that defendant's use of the same or similar trade dress is likely to confuse consumers.

It is further my understanding that the trade dress of a product may be described as the overall look and feel of a product. In this case, the trade dress at issue is the overall look and feel of the GoSports game shown below:

*GoSports Giant Four In a Row Game*



This product is described in the complaint as "the overall appearance of P&P's FOUR IN A ROW which may be described as a combination of individual features, including, but not limited to the unique color combination of flat white colored square board with evenly spaced round-hole cut-outs, bordered by a thin bas-relief bezel on all four sides, with two mirrored sculpted legs extending half way up the sides of the bezel and joined to it by tee joints which enfold part of the bezel to create a relief on the bezel and extend depth-wise slightly both frontwards and backwards, and which vertically extend slightly below the bezel where they are joined with the feet to create a relief between them on the outside edge, the feet extend depth-wise from the legs with their flat-top extending into rounded shoulders and squared ends with an arch type shape cut into the bottom-center, which are all contrasted with the smooth, circular flat-red and flat-blue featureless chips game pieces as shown in Exhibit A." (See Dkt. No. 1-1). This description serves to describe its appearance in written format.

**Expert Report of Robert Wallace**

This report will also reference evidence of actual confusion between the products in question as reported through of the owners of P&P Imports LLC, which is caused, in my opinion, by the Defendant's use of Plaintiff's trade dress.

Finally, I was asked to offer my expert opinion of the Defendant's evident intent in using the Plaintiff's original, pre-existing trade dress and therefore if the Defendant's actions warrant damages in the form of reimbursement of the Plaintiff's lost sales, apportionment of the Defendant's incremental sales and corrective advertising to reverse the current consumer confusion.

**Expert Report of Robert Wallace**

### III.    Established Practices in Creating Meaningfully Distinctive Trade Dress

The primary purpose of a brand's identity, which includes among other things its trade dress, is to communicate to the consumer and differentiate the brand from competitive products through its use of a unique look and feel of the product. In order to achieve this meaningful differentiation, the brand owner must conduct an audit of substantially all relevant competitive brands and deconstruct their core identities and trade dress to determine a design strategy that will distinguish their product from the competition.

It is my understanding that a company's trade dress may include functional elements combined together in a nonfunctional way. It is my further understanding that this is typically shown by identifying ornamental, incidental, or arbitrary aspects of the combination that do not put competitors at a significant non-reputational-related disadvantage or affects the cost or quality of the article.

In the case of a four in a row game—they all function to play "4 in a row". This does not mean that their overall look is functional, but rather that they contain elements, for example, the "game chips" that function to identify the location selected by a player, and the "holes" function so that a player may see the game chips once dropped into the game board, but the selection of color combinations (such as a white game board with blue and red game chips) is purely ornamental, incidental, or arbitrary.

I performed an informal analysis of the trade dress of a number of large four in a row games and found meaningful differentiation between all of the following examples below. This proves to me that in this product segment, namely a large scale four in a row game, trade dress is ornamental and arbitrary, meaning that the overall look and feel of the following 4 in a Row Games (i.e. their trade dress) does not provide a functional purpose or consumer benefit, and each of these games still functions to play the game 4 in a row while conveying to the consumer that is comes from a unique source. The examples below prove this.

*Giantville:*



6

**Expert Report of Robert Wallace**

*Lancaster:*



*Pressman:*



*Prextex:*



**Expert Report of Robert Wallace**

*KandyToys:*



*EZR4Kids:*



This is further illustrated in the games below which demonstrate that elements, such as the round roles, may be substituted with alternative arbitrary designs and still function as a 4 in a row game.

*Example 1 with non-round holes:*



**Expert Report of Robert Wallace**

*Example 2 with non-round holes:*



*Example 3 with non-round holes:*



These and countless other combinations available to those in the industry wishing to create their own four in a row game without infringing on another company's trade dress demonstrate to me that the overall look and feel of Plaintiff's trade dress is nonfunctional. This is further and independently confirmed by Defendant's own testimony on page 29 of the 30(b)(6) deposition of Johnenter Enterprise LLC explaining that one could use any color for the game board and any contrasting color for the game chips as shown below:

**Expert Report of Robert Wallace**

> Q    What were the color options?
>
> A    A natural or wood or stained color and a generic white.
>
> Q    What color were the chips or the game token pieces, if you understand what I'm referring to?
>
> A    In the -- at this point in time, I don't believe he gave -- for all those options, we probably could have chosen any color at that time. We hadn't made a determination on the color at this point in time in history.
>
> Q    So you could have chosen at that point in time any single color that you could think of?
>
> A    Yes.  We were not limited on our color options.
>
> Q    Were you limited on the color options between stained and a white board, or could you have selected a different color?
>
> A    We could have selected a different color.

As noted above, Plaintiff's trade dress is the overall appearance of its GoSports-branded Four in a Row game, as shown in Exhibit A to the Complaint (as reproduced below).

*From Exhibit A:*



After analyzing Plaintiff's brand identity and trade dress against my audit and deconstruction of other commercially available four in a row games, it is my opinon that its brand

10

**Expert Report of Robert Wallace**

identity is proprietary and meaningfully distinguishable from others competitors', including the competitive set pictured above, as it has a distinctive all flat white game board with flat red and blue game chips.[2] Further based on my analysis above, it is my opinion that the GoSports trade dress as a whole is non-functional.

I also analyzed the physical GoSports product. I find its trade dress to be identical to the image above and distinguishable from the relevant competition.

Further, during my interview with the owners of P&P Imports, they confirmed that Plaintiff was not aware of any all flat white game boards with flat red and blue game chips when they designed their trade dress for the GoSports game. Consistent with this, my review of the deposition transcript of Defendant likewise indicates that Defendant was unable to identify any all flat white game boards with flat red and blue game chips—other than Plaintiff's GoSports game—when they decided to make the Johnson Game. (Johnson Deposition, 33:25-34:25). This further supports my opinion that Plaintiff's GoSports game was distinctive at the time it was released and at least through the time when Defendant began selling its Johnson game.

After analyzing the Defendant's brand identity and the trade dress of the Johnson game, it is my opinion that it is nearly identical, if not identical, to the Plaintiff's trade dress as it too has an all flat white game board with flat red and blue game chips . Again, I also analyzed the physical Johnson game. I confirm that it is identical to the image below and its trade dress is exceptionally similar to the trade dress of the pre-existing GoSports game.

---

[2] I note that there are/were some four in a row games that used a white game board with blue and red game chips sold by Apple Tree International Inc., Xiao Min, and their related entities, namely Shanghai Lowen Group, Yiwu Meiwang Limited, Ningbo Zeny Products, Shanghai Guanniu Limited, Cascade Trading Ltd., and Cherry Tree International Corporation, and their brands "F2C, ZENY, ZENY PRODUCTS, ZENSPORTS, ZENSTYLE, SMARTXCHOICES, CIROCCO, NOVA MICRODERMABRASION, SEGAWE, and LEMY". It is my understanding that these games were introduced after each of the products at issue here. These entities are subject to a court order and injunction wherein they can no longer make or sell a four in a row game using GoSports valid and protectable trade dress. *See* Case No.: 8:18-cv-01542-JLS-ADS, Central District of California, Dkt. No. 69. [Order for Permanent Injunction and Settlement of Claims].

**Expert Report of Robert Wallace**

*Defendant's game:*



Based on this analysis, it is my opinion that the Defendant either acted with reckless disregard for reasonable branding industry practices in conducting a competitive audit or they intentionally copied and leveraged the Plaintiff's pre-existing trade dress when creating their Johnson game.

**Expert Report of Robert Wallace**

## IV.    Secondary Meaning of Plaintiff's Trade Dress in the GoSports Four in a Row Game

It is my understanding that acquired meaning, or secondary meaning exists when a substantial segment of the consumers and potential consumers associates a trade dress or trademark with a single source, regardless of whether consumers know who or what that source is. It is my understanding that the Ninth Circuit follows *Art Attacks Ink, LLC v. MGA Entertainment Inc*. 581 F. 3d 1138 - Court of Appeals, 9th Circuit 2009, in view of *Wal-Mart Stores, Inc. v. Samara Bros.*, 529 U.S. 205, 214, 120 S.Ct. 1339, 146 L.Ed.2d 182 (2000) in establishing the following standards to determine secondary meaning. This case law and Ninth Circuit jury instruction instruct us to examine the following factors:

- (A) Consumer Perception (whether consumers associate Plaintiff's trade dress with a single source);
- (B) Advertisement (Plaintiff's use of the trade dress in its advertising/sales listings);
- (C) Demonstrated Utility (Was Plaintiff successfully in using this trade dress to increase the sales of its GoSports game)
- (D) Extent of Use. (Plaintiff's length of time and manner of using the trade dress);
- (E) Exclusivity. (Whether Plaintiff was the exclusive user the trade dress;
- (F) Copying. (Whether the defendant intentionally copied the trade dress is strong evidence itself);
- (G) Actual Confusion. (Consumer survey evidence); and
- (H) Other factors, including: Defendant's knowledge of the marketplace success of the Plaintiff

I have analyzed each of these factors below, in-turn.

### A.    Consumer Perception

The secondary meaning survey that I conducted proves to me that the Plaintiff's trade dress is strong in that a majority of respondents associate Plaintiff's trade dress with a single source. The secondary meaning survey shows that **63.0 percent** of respondents believe that the Plaintiff's game is from a single company, source or producer. The secondary meaning survey results are discussed in detail in my report in section VII(E). The secondary meaning survey indicates that a clear majority of consumers and prospective consumers believe that the Plaintiff's game is from one source.

### B.    Advertisement

On April 28, 2020, I interviewed Peter Engler and Peter Tanoury – the two owners of P&P Imports LLC. Based on that interview, it is clear to me that Plaintiff has expertise in selling products on Amazon.com and utilizing Amazon's advertising options including "deals," Amazon marketing services or "AMS," and Amazon marketing allowances to quickly establish and drive brand recognition.

**Expert Report of Robert Wallace**

For example, Plaintiff explained to me that Amazon deals can be as brief as a few hours, while others Amazon deals can last for weeks. As explained to me by Mr. Engler during my interview, these deals come at a significant cost, but they are a valuable tool to get the image of your product in front of as many eyes as possible that are in a target market.

The second main form of advertising used by Plaintiff was what is referred to as "AMS". AMS stands for Amazon Marketing Services, and this is Amazon's internal advertising service that allows vendors to submit 'cost per click' advertising programs to promote their products in various locations on Amazon. Additionally, Plaintiff provides Amazon with an 8% marketing allowance to fund various marketing campaigns within and outside of Amazon , such as to promote items to third party sites (Google, Yahoo, Bing, etc.), affiliate referrals, email campaigns, PR pitches and more. Plaintiff explained to me that these efforts are supported by Plaintiff's document production, bates labeled PNPJ000286-978 and PNPJ007110-PNPJ009240.

Mr. Engler further explained that Plaintiff conducted grass roots marketing by often setting up the GoSports game here at Orange County beaches on the weekends where it could be seen by large crowds and beachgoers.

In this case, Plaintiff explained that it had such significant initial success that it needed to limit its spend on deals and AMS so they would not run out of inventory as their sales quickly shot up in the first few months after launch. When Mr. Engler looked back at the deal and AMS spend, it seems that around the time the Johnson Game entered the market, Plaintiff started to have to increase its advertising spend which in my opinion is expected when consumer confusion between products is present

As an additional confirmation, I further reviewed how quickly these efforts took hold by looking at data showing the sales rank (Amazon's BSR Score) for the GoSports game after its launch and before Defendant's Johnson game was release from helium10 and discussed the same with Mr. Engler.

I note that around the GoSports game launch in December of 2016, the GoSports game had an initial sales rank or "BSR"/Best Seller Rank of 578,725 in Toys and Games. BSR is a ranking system used by Amazon as an estimate of how well the product is selling compared to all of the other toys and games available. A higher BSR ranking is associated with fewer views, lower popularity, and a lower BSR is associated with more views and more popularity. Shown below is a screen shot of the BSR for the GoSports game on December 8, 2016.

**Expert Report of Robert Wallace**

*Screenshot of GoSports BSR:*



*Screenshot of GoSports BSR (enlarged view)*:



As shown in the screenshhots above, Plaintiff was able to quickly and substantially increase its views and popularity by and drive its BSR down from 578,725 to 36,778 (lower is better) by December 18, 2016 and continued this trend all the way down to 4,385 by February 17, 2017.[4] At about the time Defendant's began to sell its Johnson Game, the GoSports game reached a BSR of 179 for all available toys and games on July 11, 2017, as shown below:

---

[3] PNPJ007098

[4] PNPJ007098-7102

**Expert Report of Robert Wallace**

*Screenshot of GoSports BSR (enlarged view)*:



This marked increase began to change about the time when Johnson game was disseminated into the marketplace, resulting in the GoSports ranking climbing back up as would be expected when there is consumer confusion with the GoSports game. This further and independently confirms my opinion that secondary meaning of the GoSports game took hold very soon after launch, likely as early as February 2017, and surely by June/July 2017 around the time Johnson began selling its product on Amazon. Such quick acquisition of secondary meaning typically happens in my experience when the overall look and feel of the product is very distinctive, such as in this case. Independent of the survey, this factor weighs in favor of finding that the trade dress has secondary meaning.

### C.    Demonstrated Utility

Plaintiff's was successful in using this trade dress to increase the sales of its GoSports game. As shown in Plaintiff's Amazon sales listing, Plaintiff's flat white game board with flat red and blue chips is plainly visible and is the main focal point of the entire advertisement/sales listing. Shipping boxes and containers are not displayed, so only the overall look and feel of the product is/was used by Plaintiff to drive sales of its GoSports game. Independent of the survey, this weighs in favor of finding that the trade dress has secondary meaning.

### D.    Extent of Use

It is my understanding that Plaintiff developed the trade dress for the GoSports game in 2016 in Orange County, California and it used that trade dress consistently and continuously since

---

[5] PNPJ007101

Expert Report of Robert Wallace

inception, and its advertising efforts using the trade dress are described above. Independent of the survey, this factor weighs in favor of finding that the trade dress has secondary meaning.

### E.   Exclusivity

It appears undisputed that Plaintiff was the first company to make a white four in a row game with blue and red game chips, as Defendant was unable to recall any other four in a row game what was white when they purchase the GoSports game and sent it off to their manufacturer (Johnson Deposition, 33:25-34:25 ):

```
   others or not.  But sitting here today, like
you asked, I don't recall that there was any
others that sold a white board.
```

Defendant further could not identify any documents showing that the trade dress was commonly found in other third-party products or have been placed in the public domain. (Johnson Deposition, 14:10-19):

```
      THE WITNESS:  We do -- Johnson Enterprises
does not have any documents that shows that the
asserted trade dress for the product is generic
and commonly found, et cetera.
```

Independent of the survey, this factor weighs in favor of finding that the trade dress has secondary meaning.

### F.   Copying

Defendant certainly appears to have copied Plaintiff's trade dress. First, the products are, in fact, substantially similar, as both use a nearly identical design with a flat white game board with flat red and blue game chips. While copying can sometimes be implied simply by the substantial similarity between products, here we have more evidence to corroborate such a claim. Defendant admitted to purchasing the GoSports Game, and sending it directly to its manufacturer (Johnson Deposition, 17:16-18:13):

**Expert Report of Robert Wallace**

> purchased the samples from -- I purchased the
> samples from some sellers on Amazon and then sent
> those samples to China.
>
>          Q    Can you tell me the names of the sellers
> that you purchased products from?
>
>          A    Yard Games and GoSports.
>
>          Q    Do you recall which GoSports products you
> purchased?
>
>          A    Their 3-foot version of their Four In A
> Row game.
>
>          Q    And did you send that product to your
> manufacturer in China?
>
>          A    Yes.

*See also* JHN00001041 (Sales Receipt for Defendant's purchase of Plaintiff's GoSports Game):



Defendant admitted to doing research using a program called "jungle scout" to get an idea of how well the GoSports game was selling and referred to GoSports as the top seller (Johnson Deposition 32:17-33:12):

**Expert Report of Robert Wallace**

```
8    1032.  Going to the comment at 1:07:52.  It's a

9    message sent by you saying, The top seller on Amazon

0    is selling 700 units per month.

1              By top seller, are you referring to

2    GoSports?

3         A    Yes.
```

Defendant ultimately decided to make a substantially similar four in a row game. The most logical explanation, based on my experience in the industry given these additional facts, is that the Defendant set out, and did, copy the Plaintiff's trade dress. Independent of the survey, this factor weighs in favor of finding that the trade dress has secondary meaning.

### G.    Actual Confusion

As explained in more detail in Section V(G), I conclude that there is marketplace confusion between the GoSports Game and Johnson Game. I also note below in Section V(G) that my survey evidence is further and independently supported by my discussions with Plaintiffs Co-Owner and Founder Mr. Tanoury on April 29, 2020 regarding his own confusion when he first saw the Johnson game as well as evidence of confusion known to him based on consumer calls for replacement coins that do not fit in the allegedly "3 ft. white game" actually purchased by the consumer. In my comparison of the physical products I attempted to use the GoSports game coins in the Johnson Game and confirmed that the GoSports game coins are slightly too large to fit into the Johnson game. Independent of the survey, this factor weighs in favor of finding that the trade dress has secondary meaning.

### H.    Knowledge of Plaintiff's Success

It is my understanding that courts may consider other factors that weigh on secondary meaning. In my experience, knowledge of a competitor's success of a certain product and its trade dress prior to development of a product is a strong indication of secondary meaning.

It is my understanding that based on my review of the deposition transcript that Defendant was well aware of the success of Plaintiff and its GoSports Game. In particular, at page 32 lines 17-23, Defendant refers to the GoSports game as "The top seller on Amazon":

**Expert Report of Robert Wallace**

| | |
|---|---|
| 8 | 1032.  Going to the comment at 1:07:52.  It's a |
| 9 | message sent by you saying, The top seller on Amazon |
| 0 | is selling 700 units per month. |
| 1 |       By top seller, are you referring to |
| 2 | GoSports? |
| 3 |    A   Yes. |

*See also* (Johnson Deposition, 33:16-24):

> Q    Why in your -- why were you looking at the
> top seller on Amazon for a 3-foot Four In A Row
> game?
>
> A    At that time in 2017, we were looking to
> expand the amount of products we sold in the Yard
> Games category, and we wanted to produce a Giant
> Four In A Row game.  So we did -- loosely term --
> market research and looked at our -- at the sellers
> on Amazon that were successful at the time.

Thus, Defendant was well aware of Plaintiff, its GoSports brand, the GoSports game, and GoSports marketplace success for its GoSports game. Independent of the survey, this factor weighs in favor of finding that the trade dress has secondary meaning.

**Expert Report of Robert Wallace**

## V.       Likelihood of Confusion

It is my understanding that a likelihood of confusion exists when customers viewing the mark in question would assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark.

It is my further understanding that the Ninth Circuit follows *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348–49 (9th Cir. 1979) in establishing the following standards to determine likelihood of confusion. This case law instructs us to examine eight factors:

(A) strength of the mark or marks,
(B) proximity of the goods,
(C) similarity of the marks/trade dress,
(D) evidence of actual confusion,
(E) marketing channels used,
(F) type of goods and the degree of care likely to be exercised by the purchaser,
(G) defendant's intent in selecting the mark/trade dress, and
(H) likelihood of expansion of the product lines.

The following subsections have been structured to address each of these factors. I also understand that Courts do not require that all factors be met, but rather the fact finder should consider the totality of all of the factors when making in its determination.

### A.       Strength of the Plaintiff's Trade Dress

The secondary meaning survey that I conducted proves to me that the Plaintiff's trade dress is strong in that a majority of respondents associate Plaintiff's trade dress with a single company, source or producer. The secondary meaning survey shows that **63.0 percent** of respondents believe that the Plaintiff's game is from a single company, source or producer. The secondary meaning survey results are discussed in detail in my report in section VII(E). The secondary meaning survey indicates that a clear majority of consumers and prospective consumers believe that the Plaintiff's game is from one company, source or producer.

This is further supported by the fact that Defendant admitted to doing research using a program called "jungle scout" to get an idea of how well the GoSports game was selling and referred to GoSports as the "top seller" (Johnson Deposition 32:17-33:12):

**Expert Report of Robert Wallace**

```
8    1032.  Going to the comment at 1:07:52.  It's a

9    message sent by you saying, The top seller on Amazon

0    is selling 700 units per month.

1              By top seller, are you referring to

2    GoSports?

3         A    Yes.
```

Independent of the survey, this factor weighs in favor of finding that there is a likelihood of confusion between Plaintiff's GoSports Game and Defendant's Johnson Game.

**B.      Proximity of goods**

I understand that both of the products in question are primarily sold on Amazon in addition to other retail outlets. Consumers can have two browsers open concurrently and be viewing each of the products in question sequentially or literally adjacent to one another. Additionally, one product may be advertised by Amazon on the same browser page or application. As shown below, when an Amazon search is done for "white four in a row" or "3 foot four in a row" one can see that both products are displayed on the same page and right next to eachother:

 

*See* PNPJ009243-9244.

**Expert Report of Robert Wallace**

The proximity of goods is very close. Independent of the survey, this factor weighs in favor of finding that there is a likelihood of confusion between Plaintiff's GoSports Game and Defendant's Johnson Game.

### C.    Similarity of the Trade Dress

The Johnson Game uses a nearly identical white game board and blue and red game chips as the GoSports Game trade dress. (*See also* Johnson Deposition, 54:17-55:18 [confirming that the Johnson Game used a white game board with blue and red chips]):

```
        Q     What color is the game board shown here?

        A     In this picture, it appears to be white.

        Q     And what color do the playing chips appear
to be in this picture?

        A     They appear to be blue and a red.
```

While the physical Johnson Game is slightly smaller in size, Johnson nevertheless consistently advertised its product as a "3-foot" four in a row game adding to the confusion and otherwise unfairly competing (See Johnson Deposition, 55:3-13):

```
        Q     So you would agree that you describe your
game as a 3-foot-by-2-foot game shown here in
Exhibit 10?

        A     The title of the listing appears to say a
3-foot-by-2-foot.

        Q     If you can look down to the last line
right before that dark line, black line at the
bottom.  Can you read that off for me.

        A     Measures 3 foot by 2 foot and comes with a
quick puck release to release game pieces.  Includes
42 tailgating pucks.
```

*See also* Johnson Deposition, 45:9-46:21; 54:17-58:21

The likelihood of confusion survey proves to me that there is a significant confusion of the products in question being the same product or from the same or affiliated sources.

This is further and independently supported by defendant's own admission that their four in a row game uses a substantially similar white game board with red and blue game pieces. Independent of the survey, this factor weighs in favor of finding that there is a likelihood of confusion between Plaintiff's GoSports Game and Defendant's Johnson Game.

**Expert Report of Robert Wallace**

### D.     Evidence of Actual Confusion

Survey evidence is commonly used to determine actual confusion. I discuss my survey results in more detail below and conclude that the survey demonstrates actual consumer confusion.

This is further and independently supported by my interview with Plaintiffs Co-Owner and Founder Mr. Tanoury on April 29, 2020 regarding his own confusion when he first saw the Johnson game as well as evidence of confusion known to him based on consumer calls for replacement coins that do not fit in the allegedly "3 ft. white game" actually purchased by the consumer. Independent of the survey, this factor weighs in favor of finding that there is a likelihood of confusion between Plaintiff's GoSports Game and Defendant's Johnson Game.

### E.     Marketing Channels Used

As mentioned, these products are sold in the same class of trade including online retailers like Amazon and a few other online e-commerce platforms.

It is my understanding that in additional to Amazon, Plaintiff has sold it products at eBay, Wayfair, Houzz, The Home Depot, Hinda Incentives, S&S Worldwide, Epic Sports, and Disc Store, and Williams Sonoma and recently at playgosports.com. It is my further understanding that in addition to Amazon, Defendant has sold its products at least at tailgatingpros.com, Etsy, eBay, and Walmart.com.

It is also my understanding thorough my April 28, 2020 interview with Mr. Engler that Plaintiff has always provided Amazon with a marketing budget to market its products and has needed to expend a significant sum of money to maintain its sales after the Johnson game began marketing and selling its products and this has increase over time. Independent of the survey, this factor weighs in favor of finding that there is a likelihood of confusion between Plaintiff's GoSports Game and Defendant's Johnson Game.

### F.     Type of goods and the degree of care likely to be exercised by the purchaser

Because the products in question are not excessively expensive (e.g., thousands of dollars like a car or a Rolex® watch), it is likely that the purchasers do not exercise such a high degree of care as to spend a substantial amount of time viewing the products. And in my experience, I have found that consumers are not very careful when viewing substantially similar products on Amazon at this price point (under $100).

Because of the large size of the products, they are typically, if not always, shown advertised assembled outside its shipping container, as is illustrated in the survey stimuli. Moreover, the fact they are sold online, consumers are going to focus on the main image of the product. There is not an opportunity for consumers to be carefully inspecting any cardboard shipping containers or small marks on the products—especially when viewing a thumbnail image on the Amazon application or the Amazon website. Therefore, I believe that consumers are likely to focus on the overall look and feel of the product as it would be shown on an online listing's main image or its thumbnail

**Expert Report of Robert Wallace**

images when they are scrolling to purchase, again, as reflected in the survey stimuli. Independent of the survey, this factor weighs in favor of finding that there is a likelihood of confusion between Plaintiff's GoSports Game and Defendant's Johnson Game.

### G.   Defendant's intent in selecting the mark

As outlined above, the Defendant in developing the Johnson Product either willfully disregarded competitive products and their trade dress, or they willfully and intentionally copied the Plaintiff's trade dress in order to capture some of the GoSports brand's pre-existing recognition and good will. In my opinion, the Defendant willfully copied Plaintiff's trade dress so as to drive incremental sales.

It is my understanding that based on my review of the deposition transcript that Defendant was well aware of the success of Plaintiff and its GoSports Game. In particular, at page 32 lines 17-23, Defendant refers to the GoSports game as "The top seller on Amazon":

| | |
|---|---|
| 8 | 1032.  Going to the comment at 1:07:52.  It's a |
| 9 | message sent by you saying, The top seller on Amazon |
| 0 | is selling 700 units per month. |
| 1 | By top seller, are you referring to |
| 2 | GoSports? |
| 3 | A    Yes. |

*See also* (Johnson Deposition, 33:16-24):

> Q    Why in your -- why were you looking at the
> top seller on Amazon for a 3-foot Four In A Row
> game?
>
> A    At that time in 2017, we were looking to
> expand the amount of products we sold in the Yard
> Games category, and we wanted to produce a Giant
> Four In A Row game.  So we did -- loosely term --
> market research and looked at our -- at the sellers
> on Amazon that were successful at the time.

**Expert Report of Robert Wallace**

Additionally, Defendant specifically purchased the GoSports 3-foot version of Plaintiff's four in a row game and sent that product to its manufacturer in China (Johnson Deposition, 17:16-18:13):

> purchased the samples from -- I purchased the samples from some sellers on Amazon and then sent those samples to China.
>
>     Q   Can you tell me the names of the sellers that you purchased products from?
>
>     A   Yard Games and GoSports.
>
>     Q   Do you recall which GoSports products you purchased?
>
>     A   Their 3-foot version of their Four In A Row game.
>
>     Q   And did you send that product to your manufacturer in China?
>
>     A   Yes.

*See also* JNJ00001041 (Sales Receipt for Defendant's purchase of Plaintiff's GoSports Game):



All of these factors lead me to conclude that Defendant intended to copy Plaintiff's trade dress and leverage its success in the marketplace. Independent of the survey, this factor weighs in favor of finding that there is a likelihood of confusion between Plaintiff's GoSports Game and Defendant's Johnson Game.

**Expert Report of Robert Wallace**

### H.        Likelihood of expansion of the product lines

As confirmed in its website[6] and on Amazon[7], the Defendant has already and continues to expand its line of Tailgating Pros products from the infringing four in a row game to numerous other large-scale indoor/outdoor games, cornhole games and other products. Plaintiff used its trade dress across a number of its four in a row games, including in 1 ft., 2 ft., 3 ft., and 4 ft. versions. It is likely that Defendants similarly expand its product line to other sizes.

I also note that confusion between Plaintiff and Defendant is further exacerbated by Defendants expansion and copying of other GoSports products. For example, Defendants have made an identical copy of P&P's synthetic corn product that includes an entirely ornamental "P" on the corn that Plaintiff put on there for the sole reason to identify unscrupulous copiers such as the defendant. If a consumer was trying to investigate if there was a relationship between these two companies and if the products came from the same source, Defendant's copying of other products surely adds to the confusion here. Independent of the survey, this factor weighs in favor of finding that there is a likelihood of confusion between Plaintiff's GoSports Game and Defendant's Johnson Game.

---

[6] https://www.tailgatingpros.com/

[7] https://www.amazon.com/stores/page/F30577EC-180B-4E7D-B415-992C6FB0257E

**Expert Report of Robert Wallace**

## VI.      Survey Methodologies: Secondary Meaning Survey

All three surveys conducted for this case were designed and executed in accordance with accepted standards of survey research. For example, all surveys follow the guiding principles for survey research for the purpose of litigation as outlined by Shari Diamond,[8] including but not limited to:

- Appropriate universe selection and sampling frame;
- Rigorous and valid survey design that is probative of the relevant issues in the case;
- Inclusion of representative, qualified respondents;
- Use of procedures to minimize potential biases in data collection;
- Use of objective, non-leading questions;
- Use of procedures to reduce guessing among respondents; and
- Full analysis and reporting of survey data.

The research was also guided by the provisions of the Lanham Act[9] and recognized treatises in the area of trademark research.[10]

In consumer surveys, data are collected by means of a questionnaire. In this case, both the secondary meaning and likelihood of confusion questionnaires were divided into two parts: a screener portion and the main questionnaire. The language and mechanics of the screener and main questionnaire are provided in summary below and then detailed in the screenshots of actual survey in the document attached to Appendix 2 of this report.

Following the screening questions that ensured all respondents were among the relevant consuming public and the directions requiring them to answer all questions honestly and with no outside help, the secondary meaning survey exposed respondents to an image of the Plaintiff's Go Sport product and how that product is merchandised for sale. Since a significant portion of the product in question's sales come through the internet, I represented this product as seen on Amazon. To ensure that respondents analyze these images based on the product's trade dress and not just its logo, the brand logo and all other descriptions of its source were removed from both of the stimuli indicated below.

---

[8] Diamond, S. (2011). "Reference Guide On Survey Research," in *Reference Manual on Scientific Evidence*. Federal Judicial Center/National Academy of Sciences, p. 359-423.

[9] 15 USC §1125.

[10] See, for example, McCarthy, J.T. (2003). *McCarthy on Trademarks and Unfair Competition, 4th Ed.;*

**Expert Report of Robert Wallace**

*GoSports Survey Image without Logo:*



*Amazon Representation without Brand:*



The primary questions about source where then asked. Respondents were asked "Do you recognize this product?" The respondents were then asked "Do you believe that this specific product

**Expert Report of Robert Wallace**

is made by one company or more than one company?" Those who responded company were asked: "What is the name of the company that makes this product?", an open-ended question with tabulated results. Those who responded "more than one company were asked "If you believe the products are sold by more than one company, do you believe that they come from the same source or producer?" and then "What are the names of the companies that make these products? All respondents were asked the question "Why do you say that?", an open-ended question with tabulated results. Demographic questions then followed.

Please see the screen grabs from the actual survey in the document attached to Appendix 2 of this report.

**Expert Report of Robert Wallace**

## VII.    Likelihood of Confusion Surveys

The specific survey design employed in these studies is a standard variation of the *Squirt* survey. Taking its name from the particular case in which it was first used[11]. The *Squirt* format places respondents into a marketplace scenario by exposing respondents to stimuli showing the contested products (in random order so as to prevent "order bias"), and measuring the extent to which consumers believe the products originate from the same or affiliated companies, thereby gauging consumer confusion.

A *Squirt* format is the most appropriate survey format in this case. As mentioned, the parties in this case both compete in the same market—i.e., large-scale indoor/outdoor games—and indeed, sometimes the products in question appear adjacent to one another when sold, for example when the customer has two browsers opened while searching Amazon for large-scale indoor/outdoor games can see both products on the same screen. This replicates a reasonable approximation of the market environment in which the parties operate. If confusion were to occur, it would occur in the type of exposure environment that this survey simulates.

This study also employed a design using a test vs. control format. The test vs. control study design is used to determine the impact of a variable of interest above and beyond the baseline level of impact of exogenous variables in the marketplace.[12]

Following the screening questions and instructions to answer honestly and with no outside help, the primary set of respondents saw the first primary question, "You are about to see two images of two products, each featured as you would see them at a store or on-line when shopping. Please view the following images as if you were shopping for these products with the possible intent to purchase them. For the questions, if you do not have an opinion or are unsure of your opinion, it's perfectly all right to say so".

The primary set of 100 respondents for the March 27, 2020 survey and 200 respondents for the April 8, 2020 survey then viewed photos of the two products in question and their Amazon web sites, as illustrated below. These two sets of products were always labeled as PRODUCT ONE and PRODUCT TWO but presented in random order to prevent any "order bias".

---

[11] *Squirtco v. Seven-Up Co*., 628 F.2d 1086, 1089 n.4, 1091 (8th Cir. 1980).

[12] By adding an appropriate control, the survey expert can test directly the influence of the stimulus." See Diamond, S. (2011). "Reference Guide on Survey Research," in *Reference Manual on Scientific Evidence*. Federal Judicial Center/National Academy of Sciences, p. 398.

**Expert Report of Robert Wallace**

*PRODUCT ONE:*



*PRODUCT TWO:*



The control set of 100 respondents for the March 27, 2020 survey and 200 respondents for the April 8, 2020 survey then viewed the Plaintiff's product and a control image of another competitive giant four in a row game. The product I selected as a control is similar in type to those in dispute in this matter. For example, all products, including the control, are giant/large-scale indoor/outdoor games sold through Amazon. The control product uses trade dress that is markedly different from the products in question and thus this isolates the trade dress components that are at issue in this case.

**Expert Report of Robert Wallace**

*PRODUCT ONE for the March 27, 2020 survey:*



*PRODUCT TWO for the April 8, 2020 survey:*



These products serve as a control, designed to measure the baseline level of consumer confusion within the marketplace for the relevant category of product, sometimes referred to by marketing researchers as "noise." In this study, the noise level represents the extent to which consumers mistakenly believe that the GoSports game and the third-party product are put out by the same company or are somehow affiliated, connected, or associated.

Respondents were free to consider the product imagery for as long as they wished before proceeding to the following questions. "Both of these products can be purchased on Amazon, but we are interested in who you believe makes these products. Based on the on the images you saw, do you believe that these products come from the same source or company?" All respondents were then asked: "Why do you say that?" Those who said *No or Not Sure* to the earlier question were then asked: *"*If you said different sources/companies, do you believe that these sources/companies are affiliated with one another." And then again asked: "Why do you say that?" Lastly, all respondents were asked: "If the product you were shopping for was advertised as being 3 feet wide

33

Expert Report of Robert Wallace

but the product you received only came with a 31 inch wide game board, would that negatively affect your purchasing future products from this company?"

### A.   Study Population

Surveys are conducted by collecting data from a sample, or subset, of the population of interest, i.e., the larger group to which the study results may be projected. Courts have accepted survey populations of 100 or 200 respondents per set (or 200/400 total consumers divided between primary and control sets) as being representative of the general public. Accordingly, the population of interest for this study is comprised of consumers who would potentially have exposure to the parties' products and be likely purchasers of the parties' products in the marketplace—i.e., likely purchasers of giant/large-scale indoor/outdoor games. Additionally, and consistent with typical marketing research practice, only respondents aged 13 and older were permitted to participate in the study. Respondents who met the study population definition were identified through the use of screening questions that qualified respondents on the above criteria (*see* Questionnaire in Appendix 2).

### B.   Survey Fielding and Data Collection

These surveys were completed through online interviewing via the Internet. Online interviewing is the dominant data collection method used in marketing research today.[13] Data collection for these studies took place in March and April, 2020.

The three surveys programming, fielding, and data collection was provided by Illume, Inc., a leading provider of online sample for research projects in the U.S.[14] Illume creates the studies into test websites, conducts the survey collects and tabulates the date. To select the proper respondents, Innovate works with the paneling company Innovate MR, Inc. who maintains an actively managed online panel of millions of consumers. Membership in the panel is by invitation only, and Innovate MR employs and enforces a range of policies and procedures to ensure "panel health"—i.e., that the panel is nationally representative and that respondents provide honest and accurate answers to questions. Additional panel health checks include participation limits, screening questions, digital fingerprinting, IP verification, anti-automation filtering, random and illogical responding, capturing and removing flatliners and speeders, among others. Illume utilizes a "double opt-in" procedure in its recruitment process, which helps to verify the respondent's identity and ensure the panel is populated by quality participants.[15]

---

[13] *Global Market Research 2017: An ESOMAR Industry Report*, p. 23-24

[14] http://www.illume-research.com

[15] https://www.innovatemr.com

**Expert Report of Robert Wallace**

I have used Illume and Innovate MR as a sample provider for many consumer research studies. I can attest that their procedures follow court-accepted survey protocols, and that they provide high quality, representative respondents.

The studies were conducted under "double blind" conditions—neither Illume, Innovate MR nor the survey participants knew the purpose of the study or the sponsoring party. Double blind research is designed to prevent external or circumstantial bias from impacting the survey process and results.

### C.    Accuracy of Results

Surveys typically, and in this case, are designed such that the results are reliable at the 95 percent confidence level[16]. A total of 200 respondents qualified for and completed the Secondary Meaning survey and the March 27, 2020 Likelihood of Confusion study and a total of 400 respondents (200 primary and 200 control sets) qualified for and completed the April 8, 2020 Likelihood of Confusion survey. Samples of this size are associated with a maximum margin of error of ±4.9 percentage points at 95 percent confidence.[17]

### D.    Bias Management and Extracting Nonsensical Answers

All efforts were made to present the survey questions in an objective, unbiased, and non-leading format. Respondents were presented with a "don't know" or "no opinion" answer option wherever appropriate throughout the survey to minimize guessing.

I analyzed the final raw data to ensure its integrity. I reviewed the open-ended responses for low-quality and/or nonsense responses. Nonsensical responses are not reflective of actual consumer opinions and therefore introduce biases into the data. Based on this criterion, I eliminated only 2 nonsensical responses suggesting that these respondents were not taking the survey in earnest, and therefore, these responses have been extracted from the survey data.

---

[16] "Traditionally, scientists adopt the 95% level of confidence, which means that if 100 samples of the same size were drawn, the confidence interval expected for at least 95 of the samples would be expected to include the true population value." *See* Diamond, S. (2011). "Reference Guide On Survey Research," in Reference Manual on Scientific Evidence. Federal Judicial Center/National Academy of Sciences, p. 381.

[17] Visser, P. S., Krosnick, J. A., & Lavrakas, P. J. (2000). Survey research. In H. T. Reis & C. M. Judd (Eds.), *Handbook of Research Methods in Social and Personality Psychology*. Cambridge University Press, p. 240.

**Expert Report of Robert Wallace**

**Expert Report of Robert Wallace**

E.       **Secondary Meaning Results & Analysis**

The findings of this study confirm that a majority of consumers believe that the Plaintiff's product comes from one source and therefore has established relevant secondary meaning.

Of the 200 respondents, 188 of them, or 94.0 percent recognized the product

| Q11 - {Graphic: game2.jpg} {Graphic: game2.jpg} Do you recognize this product? | | | | | |
|---|---|---|---|---|---|
| | | Frequency | Percent | Valid Percent | Cumulative Percent |
| Valid | 1 Yes | 188 | 94.0 | 94.0 | 94.0 |
| | 2 No | 12 | 6.0 | 6.0 | 100.0 |
| | Total | 200 | 100.0 | 100.0 | |

A significant percentage of consumers, e.g. 46.0 percent believe that the Plaintiff's product comes from a single company:

| Q12 - Do you believe that this specific product is made by one company or more than one company? | | | | | |
|---|---|---|---|---|---|
| | | Frequency | Percent | Valid Percent | Cumulative Percent |
| Valid | 1 One company | 92 | 46.0 | 46.0 | 46.0 |
| | 2 More than one company | 80 | 40.0 | 40.0 | 86.0 |
| | 3 Don't know, not sure | 28 | 14.0 | 14.0 | 100.0 |
| | Total | 200 | 100.0 | 100.0 | |

Of those 80 respondents who responded that the product in question comes from more than one company, 34 of them believe that the product comes from a single source or producer.

| Q14 - If you believe the products are sold by more than one company, do you believe that they come from the same source or producer? | | | | | |
|---|---|---|---|---|---|
| | | Frequency | Percent | Valid Percent | Cumulative Percent |
| Valid | 1 Yes | 34 | 17.0 | 42.5 | 42.5 |
| | 2 No | 30 | 15.0 | 37.5 | 80.0 |
| | 3 Don't know / Not sure | 16 | 8.0 | 20.0 | 100.0 |
| | Total | 80 | 40.0 | 100.0 | |
| Missing | System | 120 | 60.0 | | |
| Total | | 200 | 100.0 | | |

When the 92 respondents who believe the product comes from one company is added to the 34 respondents who believe the product comes from one source or producer, it results in 126 of the 200 total respondents or **63.0 percent** of respondents who believe that the Plaintiff's product is from a single source or company. This indicates that a clear majority of the general public believe that the Plaintiff's product is from one source and has established secondary meaning.

37

**Expert Report of Robert Wallace**

### F.      Likelihood of Confusion Results & Analysis

The findings of both the March 27, 2020 and April 8, 2020 surveys both confirm that a majority of consumers believe that the products in question are the same or come from the same or affiliated sources.

Of the 100 primary respondents from the March 27, 2020 survey, 69 of them (or 69 percent of the overall population) recognized the products in question as being the same or coming from the same company.

| Q12a - Both of these products can be purchased on Amazon, but we are interested in who you believe makes these products. Based on the on the images you saw, do you believe that these products come from the same company? | | Frequency | Percent | Valid Percent | Cumulative Percent |
|---|---|---|---|---|---|
| Valid | 1 Yes, Same source / company | 69 | 34.5 | 69.0 | 69.0 |
| | 2 No, Different sources / companies | 16 | 8.0 | 16.0 | 85.0 |
| | 3 Not sure/ don't know | 15 | 7.5 | 15.0 | 100.0 |
| | Total | 100 | 50.0 | 100.0 | |
| Missing | System | 100 | 50.0 | | |
| Total | | 200 | 100.0 | | |

Of the 200 primary set respondents from the April 8, 2020 survey, 105 of them (or 52.5 percent of the overall population) recognized the products in question as being the same or coming from the same company.

| Q12a - Both of these products can be purchased on Amazon, but we are interested in who you believe makes these products. Based on the on the images you saw, do you believe that these products come from the same company? | | Frequency | Percent | Valid Percent | Cumulative Percent |
|---|---|---|---|---|---|
| Valid | 1 Yes, Same source / company | 105 | 26.3 | 52.5 | 52.5 |
| | 2 No, Different sources / companies | 77 | 19.3 | 38.5 | 91.0 |
| | 3 Not sure/ don't know | 18 | 4.5 | 9.0 | 100.0 |
| | Total | 200 | 50.0 | 100.0 | |
| Missing | System | 200 | 50.0 | | |
| Total | | 400 | 100.0 | | |

Of the 31 primary respondents from the March 27, 2020 survey who responded "No Different sources/companies" or "Not sure/don't know" to the earlier question, 10 of them (or 10 percent of the overall population) stated that these products come from affiliated companies/sources.

38

**Expert Report of Robert Wallace**

| Q14a - If you said different sources/companies, do you believe that these sources/companies are affiliated with one another? | | Frequency | Percent | Valid Percent | Cumulative Percent |
|---|---|---|---|---|---|
| Valid | 1 Yes, affiliated company | 10 | 5.0 | 32.3 | 32.3 |
| | 2 No, non-affiliated companies | 7 | 3.5 | 22.6 | 54.8 |
| | 3 Not sure/ don't know | 14 | 7.0 | 45.2 | 100.0 |
| | Total | 31 | 15.5 | 100.0 | |
| Missing | System | 169 | 84.5 | | |
| Total | | 200 | 100.0 | | |

Similarly, of those 95 who answered no different sources/companies" or Not sure/ don't know to the April 8, 2020 survey were then asked if these different sources/ companies were affiliated. An additional 33 (or 17 percent of the overall population) believe that these products are from affiliated companies.

| Q14a - If you said different sources/companies, do you believe that these sources/companies are affiliated with one another? | | Frequency | Percent | Valid Percent | Cumulative Percent |
|---|---|---|---|---|---|
| Valid | 1 Yes, affiliated company | 33 | 8.3 | 34.7 | 34.7 |
| | 2 No, non-affiliated companies | 33 | 8.3 | 34.7 | 69.5 |
| | 3 Not sure/ don't know | 29 | 7.3 | 30.5 | 100.0 |
| | Total | 95 | 23.8 | 100.0 | |
| Missing | System | 305 | 76.3 | | |
| Total | | 400 | 100.0 | | |

In a follow up question, this same sub set of respondents were asked if these sources were sponsored by or needing the approval of one another. In the March 27, 2020 survey, an additional 10 respondents (10 percent of the overall population) believe that these products are from companies that are sponsored by or needing the approval of one another. And 31 respondents from the April 8, 2020 survey (or 15.5% of the total population) believe that these products are from companies that are sponsored by or needing the approval of one another.

**Expert Report of Robert Wallace**

**Q15a - If you said different sources/companies, do you believe that these sources/companies are sponsored by one another or needing the approval of one another?**

| | | Frequency | Percent | Valid Percent | Cumulative Percent |
|---|---|---|---|---|---|
| Valid | 1 Yes companies that are sponsored and/or needing approval from one another | 10 | 5.0 | 32.3 | 32.3 |
| | 2 No, non- sponsored or non- approved companies | 9 | 4.5 | 29.0 | 61.3 |
| | 3 Not sure/ don't know | 12 | 6.0 | 38.7 | 100.0 |
| | Total | 31 | 15.5 | 100.0 | |
| Missing | System | 169 | 84.5 | | |
| Total | | 200 | 100.0 | | |

**Q15a - If you said different sources/companies, do you believe that these sources/companies are sponsored by one another or needing the approval of one another?**

| | | Frequency | Percent | Valid Percent | Cumulative Percent |
|---|---|---|---|---|---|
| Valid | 1 Yes companies that are sponsored and/or needing approval from one another | 31 | 7.8 | 32.6 | 32.6 |
| | 2 No, non- sponsored or non- approved companies | 38 | 9.5 | 40.0 | 72.6 |
| | 3 Not sure/ don't know | 26 | 6.5 | 27.4 | 100.0 |
| | Total | 95 | 23.8 | 100.0 | |
| Missing | System | 305 | 76.3 | | |
| Total | | 400 | 100.0 | | |

For the March 27, 2020 survey, when the 69 respondents who believe the product comes from one company is added to the 10 respondents who believe the product comes from affiliated sources and the 10 respondents who believe that the sources are sponsored by one another, it results in 89 of the 100 total respondents or **89 percent of respondents** who believe that the products in question are the same company, from the same source or from affiliated sources.

Similarly, for the April 8, 2020 survey when the 105 respondents who believe the product comes from one company is added to the 33 respondents who believe the product comes from affiliated sources and the 31 respondents who believe that the sources are sponsored by one another, it results in 169 of the 200 total respondents or **84.5 percent of respondents** who believe that the products in question are the same company, from the same source or from affiliated sources.

Both of these studies clearly indicate that a significant likelihood of confusion exists between the products in question among the majority of the relevant public.

**Expert Report of Robert Wallace**

### G. Control Set Results and Net Confusion Scores

The control set of 100 consumers for the March 27, 2020 survey and 200 consumers for the April 8, 2020 survey were asked the same questions of the P&P Import and the control product's affiliation. The results of this control segment generated lower levels of consumer confusion as indicated in the results charts below.

*March 27, 2020 survey:*

**Q12b - Both of these products can be purchased on Amazon, but we are interested in who you believe makes these products. Based on the on the images you saw, do you believe that these products come from the same company?**

| | | Frequency | Percent | Valid Percent | Cumulative Percent |
|---|---|---|---|---|---|
| Valid | 1 Yes, Same source / company | 51 | 25.5 | 51.0 | 51.0 |
| | 2 No, Different sources / companies | 35 | 17.5 | 35.0 | 86.0 |
| | 3 Not sure/ don't know | 14 | 7.0 | 14.0 | 100.0 |
| | Total | 100 | 50.0 | 100.0 | |
| Missing | System | 100 | 50.0 | | |
| Total | | 200 | 100.0 | | |

**Q14b - If you said different sources/companies, do you believe that these sources/companies are affiliated with one another?**

| | | Frequency | Percent | Valid Percent | Cumulative Percent |
|---|---|---|---|---|---|
| Valid | 1 Yes, affiliated company | 10 | 5.0 | 20.4 | 20.4 |
| | 2 No, non-affiliated companies | 20 | 10.0 | 40.8 | 61.2 |
| | 3 Not sure/ don't know | 19 | 9.5 | 38.8 | 100.0 |
| | Total | 49 | 24.5 | 100.0 | |
| Missing | System | 151 | 75.5 | | |
| Total | | 200 | 100.0 | | |

41

**Expert Report of Robert Wallace**

**Q15b - If you said different sources/companies, do you believe that these sources/companies are sponsored by one another or needing the approval of one another?**

| | | Frequency | Percent | Valid Percent | Cumulative Percent |
|---|---|---|---|---|---|
| Valid | 1 Yes companies that are sponsored and/or needing approval from one another | 10 | 5.0 | 20.4 | 20.4 |
| | 2 No, non- sponsored or non-approved companies | 22 | 11.0 | 44.9 | 65.3 |
| | 3 Not sure/ don't know | 17 | 8.5 | 34.7 | 100.0 |
| | Total | 49 | 24.5 | 100.0 | |
| Missing | System | 151 | 75.5 | | |
| Total | | 200 | 100.0 | | |

As shown above, for the March 27, 2020 survey, 51 of the 100 control respondents (or 51 percent) believe that the control product and the Plaintiff's product are from the same company, an additional 10 respondents (10 percent) believe that they are from affiliated sources/companies, and 10 respondents (10 percent) believe that these products come from sponsored sources. This indicates a total likelihood of confusion among the P&P Import and the control products of **71 percent.**

*April 8, 2020 Survey:*

42

**Expert Report of Robert Wallace**

**Q12b - Both of these products can be purchased on Amazon, but we are interested in who you believe makes these products. Based on the on the images you saw, do you believe that these products come from the same company?**

| | | Frequency | Percent | Valid Percent | Cumulative Percent |
|---|---|---|---|---|---|
| Valid | 1 Yes, Same source / company | 69 | 17.3 | 34.5 | 34.5 |
| | 2 No, Different sources / companies | 106 | 26.5 | 53.0 | 87.5 |
| | 3 Not sure/ don't know | 25 | 6.3 | 12.5 | 100.0 |
| | Total | 200 | 50.0 | 100.0 | |
| Missing | System | 200 | 50.0 | | |
| Total | | 400 | 100.0 | | |

**Q14b - If you said different sources/companies, do you believe that these sources/companies are affiliated with one another?**

| | | Frequency | Percent | Valid Percent | Cumulative Percent |
|---|---|---|---|---|---|
| Valid | 1 Yes, affiliated company | 34 | 8.5 | 26.0 | 26.0 |
| | 2 No, non-affiliated companies | 47 | 11.8 | 35.9 | 61.8 |
| | 3 Not sure/ don't know | 50 | 12.5 | 38.2 | 100.0 |
| | Total | 131 | 32.8 | 100.0 | |
| Missing | System | 269 | 67.3 | | |
| Total | | 400 | 100.0 | | |

**Q15b - If you said different sources/companies, do you believe that these sources/companies are sponsored by one another or needing the approval of one another?**

| | | Frequency | Percent | Valid Percent | Cumulative Percent |
|---|---|---|---|---|---|
| Valid | 1 Yes companies that are sponsored and/or needing approval from one another | 33 | 8.3 | 25.2 | 25.2 |
| | 2 No, non- sponsored or non-approved companies | 45 | 11.3 | 34.4 | 59.5 |
| | 3 Not sure/ don't know | 53 | 13.3 | 40.5 | 100.0 |
| | Total | 131 | 32.8 | 100.0 | |
| Missing | System | 269 | 67.3 | | |
| Total | | 400 | 100.0 | | |

For the April 8, 2020 study, 69 of the 200 control respondents (or 34.5 percent) believe that the control product and the Plaintiffs product are from the same company, an additional 34 respondents (17 percent) believe that they are from affiliated sources/companies, and 33 respondents (16.5 percent) believe that these products come from sponsored sources. This indicates a total likelihood of confusion among the P&P Import and the control products of **68 percent.**

43

**Expert Report of Robert Wallace**

It is standard practice in a survey design of this type to deduct the control findings from the primary test findings.[18] Deducting the control measurements of confusion for the March 27, 2020, or 71 percent, from the 89 percent of primary set confusion yields a **"net confusion" level of 18 percent.** Deducting the control measurements of confusion for the April 8, 2020 survey, or 68.0 percent, from the 84.5 percent of primary set confusion yields a **"net confusion" level of 16.5 percent.**

Any statically signifigant net confusion is probative of a "likelihood of confusion in the relevant public", and courts have supported a likelihood of confusion from significantly lower scores than 16.5 percent to 18 percent of the relevant public.[19]

### H.   Open ended responses indicate the similarity of the trade dress is what drives the likelihood of confusion

Analyzing the open-ended responses to question 13 "Why do you say that" provides a clear indication that the similarity in the trade dress between the Plaintiff's pre-existing trade dress and the Defendant's infringing trade dress causes this confusion.

Typical open-ended responses from the April 8, 2020 survey for example, include:

- They almost identical in the pictures and it sets at a different angle.
- they look identical to each, no difference at alal (sic)
- because it is the same product with the same characteristics
- they are identical
- They look exactly the same
- They look identical

---

[18] Jacoby, J. (2013). *Trademark Surveys, Volume 1: Designing, Implementing, and Evaluating Surveys*, p. 910-911.

[19] *See, e.g.*, *Mutual of Omaha Ins. Co. v. Novak*, 836 F.2d 397 , 400 (8th Cir. 1987), *cert. denied*, 488 U.S. 933, 109 S.Ct. 326, 102 L.Ed.2d 344 (1988) (giving significant weight to survey evidence showing confusion level of between ten and eleven percent); *Henri's Food Products Co., Inc. v. Kraft, Inc*., 717 F.2d 352 , 358 (7th Cir. 1983) cases holding that survey evidence indicating ten to twelve percent confusion was sufficient to demonstrate actual confusion); *Quality Inns Int'l, Inc. v. McDonald's Corp*., 695 F.Supp. 198, 219 (D. Md. 1988) (holding that a 16.3% confusion rate demonstrated that "an appreciable number of consumers are likely to be confused"); *Miles Laboratories Inc. v. Naturally Vitamin Supplements Inc*., 1986 WL 83319, at *12 (T.T.A.B. March 31, 2011) ("[S]urveys disclosing likelihood of confusion ranging from 11% to 25% have been found significant.") *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Management, Inc*., 618 F. 3d 1025 (9th Cir. 2010) [11% net confusion confusion]).

Expert Report of Robert Wallace

- they look like very similar products that are easy to interpret
- I don't notice the difference since it is the same product.

Overall, the findings of both surveys provide empirical evidence that a likelihood of confusion among relevant consumers exists between the products in question and based on my analysis and the open-ended responses, I conclude that is directly attributable to the similarity of the products' trade dress.

### I.      Evidence of Actual Confusion

As above, the Johnson game was first identified by Peter Tanoury when he was searching through Amazon when he viewed the Johnson game thinking it was Plaintiff's GoSports game. (P&P Deposition 34:5-19) Further based on my interview with Peter Tanoury on April 28, 2020, Mr. Tanoury described cases of consumer confusion. Specifically, Mr. Tanoury explained that its service representatives have received multiple calls from individuals wanting replacement parts (typically replacement coins) for a giant white three foot four in a row game they purchased and believed to be from GoSports. On more than one occasion, the replacement coins sent out by the customer service team were in fact slightly too big to fit the game-thus indicating that the consumer was confusing their purchase of a white giant four in a row game that was advertised as being a "3-foot game" with the 3-foot GoSports game, when in fact their purchased game was a slightly smaller game. Mr. Tanoury further explained that its customer service representatives did not know if the game was a Johnson game or not, as the customers believed they had purchased a GoSports game.

### J.      Confusion has led to brand dilution of the Plaintiff's brand

A final primary question sought to determine the impact on the Plaintiff's brand and its good will among those consumers who were confused and purchased the Defendant's brand thinking that it was the Plaintiff's brand. The question asked, if the consumer "would be disappointed to learn that the product they purchased is not 3 feet in dimension when it was advertised as being three feet. Specifically, "If the product you were shopping for was advertised as being 3 feet wide but the product that you received only came with a 31 inches wide game board, would that negatively effect your purchasing future produts from this company?"

For the March 27, 2020 survey, 59 percent of the population believe that this discovery would negatively affect their future purchase of products from the same company, as below:

45

**Expert Report of Robert Wallace**

| Q17b - If the product you were shopping for was advertised as being 3 feet wide but the product you received only came with a 31 inches wide game board, would that negatively effect your purchasing future products from this company? | | Frequency | Percent | Valid Percent | Cumulative Percent |
|---|---|---|---|---|---|
| Valid | 1 Yes, would negatively affect your future purchase | 59 | 29.5 | 59.0 | 59.0 |
| | 2 No, would NOT negatively affect your future purchase | 37 | 18.5 | 37.0 | 96.0 |
| | 3 Don't know / Not sure | 4 | 2.0 | 4.0 | 100.0 |
| | Total | 100 | 50.0 | 100.0 | |
| Missing | System | 100 | 50.0 | | |
| Total | | 200 | 100.0 | | |

The April 8, 2020 survey reported that 58.5 percent of this population would be disappointed by this discovery and it would negatively affect their future purchase of the Plaintiff's branded product, as below:

| Q17a - If the product you were shopping for was advertised as being 3 feet wide but the product you received only came with a 31 inches wide game board, would that negatively effect your purchasing future products from this company? | | Frequency | Percent | Valid Percent | Cumulative Percent |
|---|---|---|---|---|---|
| Valid | 1 Yes, would negatively affect your future purchase | 117 | 29.3 | 58.5 | 58.5 |
| | 2 No, would NOT negatively affect your future purchase | 75 | 18.8 | 37.5 | 96.0 |
| | 3 Don't know / Not sure | 8 | 2.0 | 4.0 | 100.0 |
| | Total | 200 | 50.0 | 100.0 | |
| Missing | System | 200 | 50.0 | | |
| Total | | 400 | 100.0 | | |

This proves to me that the Defendant's infringement on the Plaintiff's pre-established trade dress has negatively affected the sales of the Plaintiff's brand and damaged its good will causing what the industry refers to as brand dilution.

## VIII.   Conclusion

Based on the survey results, it is my opinion that the Plaintiff's GoSports trade dress has established strong and relevant secondary meaning among its consuming public. Further, based on

46

**Expert Report of Robert Wallace**

my analysis of the similarity between the trade dress of the products in question, the survey results and the evidence of actual confusion, it is my opinion that not only a likelihood of confusion exists, but there is actual confusion within the relevant public.

As mentioned, based on its size, success and sophistication, I believe that the Defendant could not have launched its brand identity and trade dress out of ignorance, but rather with purposeful intent to leverage the Plaintiff's brand identity and its good will. As noted above, this is corroborated by the fact that that Defendant admitted to searching for the GoSports game and classifying it as a top seller coming from the GoSports brand, purchasing the GoSports game and sending it to its factory in China, making the Johnson Game substantially similar so as to confuse consumers as to source, and advertising the Johnson Game as a 3-foot by 2-foot game to unfairly compete with the GoSports 3-foot game.

It is also clear to me that the Defendant's brand has benefitted (and continues to benefit) from their infringement on the original and pre-existing GoSports trade dress and the confusion this caused in the industry.

Further, it is my opinion, as a branding expert who has worked with numerous leading consumer product brands, that infringement of this magnitude over this extended period of time can be specifically damaging to a brand. As a branding expert I can attest that once consumer confusion has been as pervasive as it has been in this case, it is difficult to mitigate. Repeated infringement with no effort to correct the resulting confusion exacerbates the existing confusion.

For example, a typical result is seeing other third-parties attempt to also copy the trade dress, which I understand has been seen here by Plaintiff, who recently obtained an injunction against Apple Tree International, Inc. and Xiao Min. In that case, numerous shell brands related to Apple Tree International, as listed in the injunction, were all enjoined from copying Plaintiffs valid and enforceable trade dress for its GoSports game. Similar expenses and enforcement efforts are expected as a result of Defendant's infringement on the Plaintiff's trade dress in this case. Once consumer misperceptions are reinforced time and time again, as they have been in this case, they become ingrained in the target market and very difficult to remedy without a substantial investment in corrective action.

It would be particularly harmful to the market and to consumers if a company was permitted to deceive consumers by leveraging the positive associations of a pre-existing brand. The result of these actions could cause undue harm not just to brand owners but to consumers, and thereby denigrate the believability of *all* rightful branding efforts made by law abiding parties. No consumer should be subjected to such unfair competition that is designed to cause confusion and allow the consumer to believe they are getting a product made from a different source.

I respectfully reserve the right to amend this report with further comments in the event that additional information becomes available.

**Expert Report of Robert Wallace**

Rob Wallace

April 30, 2020

**Expert Report of Robert Wallace**

IX.   **APPENDIX 1: INFORMATION REVIEWED**

1. Searched and reviewed product listing for the GoSports game and the Johnson Game as well as other products produced by the Plaintiff and the Defendant
2. Searched and reviewed product listing for four in a row products
3. Interview conducted with Peter Tanoury and Peter Engler on April 28, 2020.
4. Plaintiffs Complaint and Defendant's Answer to the Complaint
5. The February 10, 2020 30(b)(6) Deposition Transcript of P&P Imports LLC (the "P&P Deposition")
6. The February 19, 2020 30(b)(6) Deposition Transcript of Johnson Enterprise LLC (the "Johnson Deposition")
7. Documents from Plaintiff's document production including:
   a. PNPJ000286-978 reviewed briefly and discussed with Peter Engler during April 28, 2020 interview
   b. PNPJ007098-7102 reviewed briefly and discussed with Peter Engler during April 28, 2020 interview
   c. PNPJ007110-PNPJ009240
   d. PNPJ009241-44
8. Documents from Defendant's document production including:
   a. JHN00001041

**Expert Report of Robert Wallace**

## X.    APPENDIX 2: SURVEYS AND RESULTS AS SEPARATE DOCUMENTS

The following documents were provided along with this report:

1. Survey Questionnaire and Stimuli:
   a.  Lawn Toys Likelihood of Confusion Printout 4-8-20.pdf
   b.  Lawn Toys Likelihood of Confusion Printout 3-27-20.pdf
   c.  Lawn Toys Secondary Meaning Printout 3-26-20.pdf


2. Survey Results:
   a.  Lawn Toys Likelihood of Confusion Final Data 4-8-20.xls
   b.  Lawn Toys Likelihood of Confusion Final Freqs 4-8-20.xls
   c.  Lawn Toys Likelihood of Confusion Final Freqs 3-27-20.xls
   d.  Lawn Toys Likelihood of Confusion Final Data 3-27-20.xls
   e.  Lawn Toys Secondary Meaning Final Freqs 3-26-20.xls
   f.  Lawn Toys Secondary Meaning Final Data 3-26-20.xls

**Expert Report of Robert Wallace**

## XI.    APPENDIX 3: CURRICULUM VITAE

Rob Wallace Expert Witness: Brand identity

---

917-860-0319

Rob@bestofbreedbranding.com

www.RobWallaceExpert.com

As the former managing partner of Wallace Church, Inc., one of the most recognized and accomplished brand identity strategy and design consultancies, I have more than thirty years of expertise in all aspects of branding strategy and design analysis for national and global brands. My core expertise is the ability to create and differentiate brand experiences that drive consumer awareness and purchase behavior.

Clients include Procter & Gamble, Coca-Cola, Unilever, Pfizer, Dell, Pepsico, Revlon, Target, The Home Depot, Johnson & Johnson, Bacardi, E&J Gallo, Mattel, Anheuser Busch, PNC Bank, Kroger, L'Oreal, Scotts/Miracle Gro, and more than 40 national/global consumer product marketers of equal caliber.

Areas of Expertise:

- Trademark/Trade Dress
- Package/Product Design
- Licensing
- Intellectual Property Marketing Strategy
- Brand Communications

- Visual Brand identity
- Advertising Claims
- Consumer Research
- Copyright Damages
- Consumer Research
- Planning/Analysis

Industry Experience:

- Food
- Personal Care
- Beverage
- OTC and Rx Drugs
- Home Products
- HBA/Beauty Care
- Wellness
- Technology Brands

- Toys/Sporting Goods
- Hard Goods
- Beer/Wine/Spirits
- B to B
- Apparel
- Retailer Brands
- Financial Services

Professional Experience:

Best of Breed Branding Consortium, LLC, *Managing Partner*, June 2014 – Present

- Actively manage a consortium of branding communications consultancies.

51

**Expert Report of Robert Wallace**

- Provide strategic consulting on all branding issues including brand name development, brand identity, graphic and structural package design, trademark and copyright development, and integration across advertising and all other brand communications.

Wallace Church, Inc., *Managing Partner, Strategy*, 1985 – June 2014

- Actively manage one of the world's most respected brand identity design consultancies.
- Provide strategic consulting on all branding issues including brand name development, brand identity, graphic and structural package design, trademark and copyright development, and integration across advertising and all other brand communications.

Peter Cris Advertising, Inc., *Vice President, Marketing*, 1984 – 1985

- Provided both the strategic and creative force for this regional advertising agency.
- Acted as primary liaison between clients and creative department.

Modular Marketing, Inc**.**, *Senior Account Manager*, 1982 – 1984

- Managed select client relationships through all creative and strategic aspects of project management for this marketing communications consultancy.
- Designed and developed brand promotion programs, corporate communications and brand identity assignments.

Grey Advertising, Inc., *Senior Account Manager*, 1981 – 1982

- Actively participated in one of the world's largest advertising agencies through the Market Horizons function, consulting with core clients on advertising and new brand communications opportunities.

Education:

- MBA coursework, The New School, New York, NY, 1981 – 1983
- BA, English, Gettysburg College, Gettysburg, PA, 1977 – 1981

Professional Activities:

- Expert speaker on brand identity design at more than 50 marketing, design and research industry events across the US, UK, Europe, Latin America and Asia
- Author of numerous articles and published case histories on brand identity design in the Wall Street Journal, Forbes, Marketing Week, Design Management Journal, Package Design Magazine and numerous other publications,
- Co-Author "Really Good Package Design Explained," Rockport Press,

51

**Expert Report of Robert Wallace**

- Lecturer on brand identity at Columbia Business School, Georgetown University, Seton Hall, University of Texas, School of Visual Arts Masters in Branding and other MBA programs of leading universities
- Board of Directors, Design Management Institute, 2010-Current
- Co-Chair of the Design Management Institute Design Value Project, 2012
- Distinguished Faculty Member, Path to Purchase Institute, speaker at national conference for the last 8 years

Professional Memberships:

- Board of Directors, the Design Management Institute,
- Co-Chair Design Value Project, the Design Management Institute
- Distinguished Faculty, Path to Purchase Institute
- American Marketing Association
- Color Marketing Group
- American Institute of Graphic Arts

**Expert Report of Robert Wallace**

## XII.    APPENDIX 4: CASES IN THE LAST FOUR YEARS

I have served as an expert witness on branding related issues on more than 65 prior occasions. In the last four years, I have served on the following cases. In many of these I have testified in deposition.

- *Woodbolt Distribution, LLC and General Nutrition Corporation v. Alteria Corporation*, U.S. District Court, Southern District of New York, 2015
- *Smart Vent Products, Inc. v. Crawl Space Door System, Inc*., U.S. District Court, Southern District of New Jersey, 2015
- *Daniel Defense, Inc. v. Remington Outdoor Company*, U.S. District Court, Southern District of Georgia, Savannah Division, 2015
- *Play Beverages, LLC, and CirTran Beverage Corp. v. Playboy Enterprises International*, Inc., U.S. District Court, Court of Cook County Illinois, Chancery Division, 2015
- *Ferring B.V., v. Fera Pharmaceuticals, Inc., et al*., U.S. District Court, Southern District of New York, 2015
- *Alexis LLC, v. French West, Inc. D/B/A Hale Bob*, U.S. District Court, Southern District of Florida, 2015
- *Newborn Bros. Co, Inc. v. Albion Engineering Company*, U.S. District Court, District of New Jersey, 2015
- *Shire City Herbals, LLC v. Nicole Telkes, et al*., U.S. District Court, District of Massachusetts, 2015
- *Anti-Aging Essentials, Inc., v. Trufood MFG, INC. F/K/A Tsudis Chocolate Co and Belmont Confection*, U.S. District Court, District of Pennsylvania, 2016
- *Pur Beverages v. Pom Wonderful*, U.S. District Court, Southern District of California, 2016
- *Smart Vent Products Inc. v. Crawl Space Door Systems, Inc*., U.S. District Court, New Jersey, 2016
- *Fireclean, LLC v. George Fennell and Steel Shield Technologies, Inc*., U.S. District Court, Eastern District of Virginia, 2016
- *SC Johnson & Sons, Inc. v. Minigrip, LLC*, U.S. District Court, Western District of Wisconsin, 2017
- *Gunterville Breathables, INC. v. Global Glove and Safety Manufacturing, Inc*., U.S. District Court, Northern District of Alabama, 2017
- *Andis Company Inc v. Spectrum Brands*, U.S. District Court, Eastern District of Wisconsin, 2017
- *Texas Outhouse, Inc. and The Gainsborough Corporation v. Fresh Can, LLC*, U.S. District Court, Southern District of Texas, 2017
- *StudioThink, LLC v. Unitrex, LTD*, Court of Common Pleas, Cuyahoga County Ohio, 2017

**Expert Report of Robert Wallace**

- *Lokai Holdings, LLC v. Twin Tiger USA, LLC*, U.S. District Court, Southern District of New York, 2018

- *K&M International, Inc. v. Rhode Island Novelty, Inc*., LLC, U.S. District Court, District of Rhode Island, 2018

- *Redbox Retail, LLC v. Xpress Retail LLC*, U.S. District Court, Southern District of Illinois, 2018

- Simon Nicholas Richmond in two Reexamination proceedings in the United States Patent and Trademark Office (USPTO), Reexamination Control No. 90/013,860 and 90/013,861, 2018

- *Roger Cofelt Jr., et al., v. The Kroger Company, et al*., District Court, Central District of California, 2018

- *Quality Products, Inc. v. Verka Food Products, et al*., U.S. District Court, Western District of Washington in Seattle, 2018

- *Shaya Eidelman, et al. v. The Sun Products Corp. et al*., U.S. District Court, Southern District of New York, 2018

- *Flying Nurses International LLC v. Flyingnurse.com et al*., U.S. District Court, Eastern District of Virginia, 2018

- *GDM Enterprises, LLC (Pure Cosmetics) v. Astral Health & Beauty, INC., (PUR Cosmetics)*, U.S. District Court, Western District of Missouri, 2019

- *BAMA ICEE LLC et al. v. J&J Snack Foods Corp et al*., U.S. District Court, Northern District Of Alabama, 2019

- *The Black & Decker Corporation, et al. v. HARBOR FREIGHT TOOLS USA, INC*., Report for Mediation, 2019

- *1231 Barrage Inc et al. v. Automobile Dealers Assoc. of Greater Philadelphia et al*., Philadelphia County Court of Common Pleas, 2019

- *Christopher Hayden v. Eagles Nest Outfitters, Inc. et al*., U.S. District Court Western District of North Carolina, 2019

- *Chantel Ray Finch v. Weigh Down Workshop Ministries, Inc. et al*., U.S. District Court, Eastern District Of Virginia, Norfolk Division, 2019

- *Mambu Bayoh v. AfroPunk Fest 2015, et al*., U.S. District Court, Southern District of New York, 2019

- *Scorocs LLC v. Innovations for Poverty Action Inc*., U.S. District Court, Western District Of Missouri, At Kansas City, 2019

- *Good L Corp v. Fasteners for Retail, Inc*., U.S. District Court, Middle District of Tennessee, 2019

- *Sunny Days Entertainment LLC v. Traxxas L.P*., U.S. District Court, District of South Carolina Greenville Division, 2019

**Expert Report of Robert Wallace**

- *Venus Et Fleur, LLC v. Affordable Luxury NY, Inc dba Pret A Fleur, et al.*, US Court, Southern District of New York, 2019
- *Rhino Metals Inc, v Sturdy Gun Safe Inc.*, U.S. District Court, District Idaho, 2019
- *American Customer Satisfaction Index, LLC v Genesys Telecommunications Laboratories*, *et al.*, U.S. District Court, Eastern District of Michigan, Southern Division, 2020
- *I.M. Wilson, Inc v Obchtchestvo S Ogranitchennoy Otvetsvennostyou "Grichko", et al.*, US Distinct Court, Eastern District of Pennsylvania, 2020
- *Country Life v. The Hain Celestial Group, Inc.*, U.S. Court, Eastern District of New York, 2020

**Expert Report of Robert Wallace**

## XIII. APPENDIX 5: PUBLISHED WORKS WITHIN THE LAST 10 YEARS

I have written a number of brand identity articles, contributed to branding texts, and have been interviewed by The Wall Street Journal, The New York Times, and more than a dozen branding and marketing communications industry publications. I have spoken at more than 50 marketing communications and design industry events across North and South America, the UK, and Europe and Asia. I have lectured on brand identity at Columbia Business School, Georgetown, the University of Texas, and other leading universities. I have conducted webinar events with more than 1,600 participants on the topic of design process and design thinking.

I am on the Board of Directors of the Design Management Institute, the most prominent global design industry association, and I co-chair its Design Value Project. I am a Distinguished Faculty Member of the Path to Purchase Institute. Please see my current CV for a listing of these and other accomplishments.

I coauthored a book entitled "Really Good Packaging Explained", released in 2009 by Rockport Publishers. I was also a contributing author with Robin Landa and the book "Build Your Own Brand", Rockport, 2013. I also wrote the forward to Christopher Durham's book, "52 The My Private Brand Project", Folio28, 2014.

In the past 10 years I have written the following articles:

- Three Critical Steps to Creating and Protecting Your Trademark, INTRA, 2017
- Redesigning the Design Industry; "The Next-Generation Consultancy", British Design Business Association, 2018

I have coauthored an article with Pamela De Cesare, former Associate Director of Package Communications, Kraft Foods, Inc., entitled "Amazing Pace, Shared Views on the Design Process", Design Management Journal, Spring 2000.

In the past ten years I have posed more than two dozen articles and posts on Wallace Church's web site: http://wallacechurch.tumblr.com/ these include but are not limited to:

- "Quantifying Design's Value"
- "Design RI Re-Envisioned"
- "Cutting through the Sea of Sameness"
- "Architecting a Brand Experience"
- "The National Color" and more

I am the founder of the Linked In Group- "Relevant Disruption in Branding" https://www.linkedin.com/groups?home=&gid=7422931 where I have posted the following articles in the last 10 years:

- "Right Here, Right NOW!"
- "Fashion Touchdown"

**Expert Report of Robert Wallace**

- "Color is Key"
- "Cool Customization"
- "Relevance for Right Now"
- "Shape Language"
- "Visual Vampires"