JAMES E. DOROSHOW (SBN 112920)
JDoroshow@FoxRothschild.com
**FOX ROTHSCHILD LLP**
Constellation Place
10250 Constellation Blvd, Suite 900
Los Angeles, CA 90067
Telephone: (310) 598-4150
Facsimile:  (310) 556-9828

Attorneys for Defendant JOHNSON ENTERPRISES, LLC,
a Virginia limited liability company
DBA TAILGATING PROS

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| P&P IMPORTS LLC, a California limited liability company,<br><br>                    Plaintiffs,<br><br>v.<br><br>JOHNSON ENTERPRISES LLC, a Virginia limited liability company DBA TAILGATING PROS; and DOES 1-10, inclusive,<br><br>                    Defendant. | Case No. 8:19-cv-00523-DOC-JDE<br><br>Hon. David O. Carter<br><br>**DECLARATION OF JAMES E. DOROSHOW IN SUPPORT OF DEFENDANT JOHNSON ENTERPRISES LLC'S  MOTION FOR LEGAL FEES AND COSTS**<br><br>**[REDACTED PUBLIC VERSION]**<br><br>Complaint Filed:    March 15, 2019<br>Complaint Served:  April 24, 2019<br>Hearing Date:     September 14, 2020<br>Time:             8:30 a.m.<br>Ctrm:           9D |

113201626.v1

I, James E. Doroshow, declare as follows:

1.      I am an attorney duly authorized to practice law in California and before this Court.  I am a partner with the law firm of Fox Rothschild, LLP, and counsel of record for Defendant Johnson Enterprises, LLC ("Johnson') in this action.  I submit this Declaration in support of Johnson's Motion for Costs and Attorney's Fees as the prevailing party in this action.  The facts stated below are based upon my personal knowledge of this case.  If called as a witness, I could and would competently testify thereto.

## I.    PROCEDURAL BACKGROUND

2.      As appears of record herein, Plaintiff P&P Imports, LLC ("P&P") filed its Complaint in this action on March 15, 2019 (Dkt. No. 1) ("Complaint").  P&P's Complaint consists of claims for: (1) trade dress infringement under *15 U.S.C. Section 1225(a)*; (2) unfair competition under *California Business and Professions Code Section 17200 et seq.;* and (3) unfair competition under California common law.  As this Court has noted, P&P's unfair competition claims under California law "are entirely predicated on its trade dress claim."  (Order at 3 citing Compl. at 9-10),  Johnson answered the Complaint (Dkt. 13) on May 14, 2019 denying all material allegations of the Complaint and all claims within it, and asserting a number of affirmative defenses. *Id*.  Johnson filed a Motion for Judgment on the Pleadings and for Summary Judgment  (Dkt. 59) and supporting Memorandum (Dkt. 61) on June 3 and 4, 2020, respectively  ("Motion").  On June 10, 2020, P&P filed its Opposition (Dkt. 71), and Johnson submitted its Reply (Dkt. 76) on June 17, 2020.

3.      On July 28, 2020, this Court issued its "Order Granting In Part Defendant's Motion for Judgment on the Pleadings and for Summary Judgment [Dkt. 119] (the "Order") granting Johnson's Motion for Summary Judgment and denying as moot Johnson's request for judgment on the pleadings.  In the Order, this Court ruled, among others, that P&P had the burden of proving distinctiveness as an element of its trade dress claim; that Johnson need only show that P&P had failed to present a genuine issue of

material fact as to distinctiveness; and that Defendant had done so, thereby making summary judgment appropriate. *Id*. at p. 5.  Among other findings, the Court ruled that "[i]gnoring the functional aspects of P&P Game's design, that P&P's trade dress consists only of a 'flat-white colored square board with evenly spaced round-hole cut-outs…contrasted with the smooth, circular flat-red and flat-blue featureless chips game pieces.'" *Id.* (citing Compl. at 17).  The Court further ruled that P&P's asserted trade dress was "plainly not inherently distinctive; there is nothing about a white frame, unmarked red chips, and unmarked blue chips that intrinsically points to Plaintiff or its GoSports brand.  It is certainly not so unique or unusual that consumers can be assumed to perceive this color scheme as an indicator of the P&P Game's origin."  In light of these filings, the Court determined that there was no genuine issue of material fact that P&P's trade dress was inherently distinctive. *Id.*

4.    The Court further ruled that P&P had failed to raise that a genuine issue of material fact that P&P's Game's trade dress had acquired secondary meaning.  In the Court's words, "[m]ost fundamentally, nothing in Plaintiff's submissions to the Court indicates that the P&P Game's trade dress has acquired 'primary significance' in the public imagination such that the white frame, unmarked red chips, and unmarked blue chips identify Plaintiff as the source of the P&P Game or that the public associates Plaintiff with the trade dress." *Id*.  The Court cited several reasons for its conclusions that Plaintiff's "purported evidence [was] unavailing." *Id*. at p. 5.  *First*, the Court found that the Wallace's analysis of secondary meaning "is almost entirely irrelevant" (even if the Court accepted as true that 63% of respondents believed that Plaintiff's product was from a single source or company) (citing Wallace Rept. at 37).  *Second,* the Court found that the "undisputed short period of exclusive use (***approximately ten months***), relatively low volume of sales [***merely ▮▮▮▮ before Johnson first began selling its product in October 2017***], and Plaintiff's inconsistent use of the trade dress further cut against any finding of secondary meaning." *Id*. at 5-6, (emphasis supplied).  *Finally*, the Court concluded that whatever questions exist about advertising and intentional copying, "they

do not rise above the level of a scintilla of evidence and fail to raise a genuine issue of material of fact." *Id*. at 6.

5.      Based upon the United States Supreme Court's decision in *Octane Fitness, LLC v. Icon Health & Fitness, Inc.*, 572 U.S. 545 (2014) ("*Octane*") regarding the recovery of attorney's fees in patent cases, and the Ninth Circuit's  adoption of the same *Octane* standards in a trademark case in *SunEarth, Inc. v. Sun Earth Solar Power Co.*, Nos. 13-17622, 15-1609, 2016 U.S. App. LEXIS 9682 (9th Cir. 2016) ("*Sun Earth*"), it is my understanding that the Court is to evaluate the "***totality of the circumstances***" in deciding whether Johnson should recover attorney fees in this case (emphasis supplied). The Ninth Circuit has also stated that, while there is no precise rule or formula for whether a prevailing trademark litigant is entitled to a fee award, to determine whether attorney's fees should be awarded under *Section 35(a)* of the *Lanham Act,* ***California federal courts should now consider whether the case "stands out from others with respect to the substantive strength of a party's litigation position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated."*** *Id*. at 4-5 (emphasis supplied).  Given the more lenient standards for an award of attorney's fees following *Octane* and *Sun Earth* I believe that Johnson has more than met the more lenient *Octane* and *Sun Earth* secondary and should be awarded attorney's fees and cost in this case.

## II.      PRELITIGATION MISCONDUCT.

6.      As discussed in Johnson's Summary Judgment Motion, P&P was founded in 2007.  Compl. at 10.  ***P&P is a litigation troll***.  Since 2007, P&P has filed fourteen lawsuits in this Judicial District alone.  Most of P&P's have settled shortly after being filed.  None of them have been have been litigated on the merits until this action.  *See* Johnson Summary Judgment Motion supporting Memorandum (Dkt. 61) at p. 1, n. 1. Early on in this litigation, P&P's counsel (Casey Kempner) told me that P&P had obtained a judgment in prior litigation in an apparent attempt to try to convince me that P&P had succeeded in the past in obtaining Court ordered relief on the merits.  In doing

3

so, however, Mr. Kempner failed to inform me that the judgment he was referring to was a Stipulated Judgment based upon settlement between the parties; not a claim on the merits.

7.    P&P has also stated in its briefing in this lawsuit that it is simply protecting its intellectual property rights by suing alleged infringers.  *See* P&P's *Motion in Limine* No. 2 (Dkt No. at 85) at 3.  Plaintiff has further stated it vigorously defends its intellectual property rights in order to maintain its position in a competitive market wherein knocking–off is rampant).  *Id.*  However, P&P has not always had sufficient grounds in these cases for suing third parties.  For example, I am currently representing a company named Pro Sports Inc. ("Pro Sports") in a pending case brought by P&P in this District entitled *P&P Imports LLC. v. Pro Sports Inc.*, Case No. 8:19-cv-00858-JLS-ADS (Hon. Josephine L. Staton) (the "Pro Sports Litigation").  The Pro Sports Litigation was filed on May 7, 2019, ***less than two months after this lawsuit was filed by one of the same lawyers representing P&P in this case*** (Casey Kempner).  Like this case, the Pro Sports Litigation involves a trade dress claim involving two of P&P's games, *i.e.*, two Ladder Toss Games.  A copy of the Complaint in the Pro Sports litigation (Dkt. No. 1) is attached hereto as Exhibit A.  One such product in that action is what P&P describes as "P&P's Premium Ladder Toss Game" (the "Premium Game").  A second is characterized by P&P as the "P&P Classic Ladder Toss Game" (the "Classic Game").  *Id*. at 13-14.  As in this case, P&P claims trade dress protection is purportedly based ***upon the colors of its games.  Among other features, the Premium Game is alleged by P&P to have a white frame***, while the Classic Game is alleged to consist of a black frame.  *Id*. at paras. 24-25. In discovery, however, it has now been learned that, contrary to P&P's allegation, the ***Premium Game does not in fact have a white frame, but a different color that P&P has not accurately characterized in its complaint***.  Attached hereto as Exhibit B is a photo of the Premium Game showing its true colors.  Thus, as part of the Pro Sports Litigation, P&P has not been honest with the Court in describing the colors of at least one of its products.

4
DECLARATION OF JAMES E. DOROSHOW

8.    It is my belief that P&P's conduct prior to filing this lawsuit and during the course of litigating it (the "totality of the circumstances") all support an award of fees. *First*, as P&P itself admits (in fact pleads) (Compl. at 16), P&P learned that Johnson was allegedly selling an infringing product in January 2018, ***15-months before this lawsuit was filed in March 2019***.  Prior to suing Johnson, P&P has admitted it never communicated with Johnson, including sending him a cease and desist letter or any other form of communication expressing any concern with Johnson's Game.  *See* P&P *Rule 30(b)(6)* Dep. at 37; P&P Response to Johnson's RFA's dated July 8, 2019, No. 6.  A copy of the Response is attached hereto as Exhibit C.  As a result, Johnson spent over a year developing, manufacturing, marketing and selling a product without any warning or notice from P&P it ever intended to take any legal action against him.  Had P&P communicated with Johnson prior to filing suit, the parties could of course had tried to resolve the claims in this lawsuit without the need for litigation and the substantial costs and fees associated with it.  Johnson also could have avoided spending significant time and expense developing, manufacturing, marketing and selling his product for ***18-months*** before being sued by P&P in March 2019 had P&P simply given Johnson the opportunity to discuss a possible resolution of P&P's claims without the need for litigation.

9.    As P&P's expert (Robert Wallace) testified at his June 22, 2020 deposition, during the ***10-month*** period between the time P&P first sold its product in December 2016 and when Johnson first sold its product in October 2017, ***P&P earned*** ███████ ███████████████████ ***from the sale of its Game.***  *See* Wallace Dep. at 80.  As this Court determined, this ***10-month*** time of use and relatively low volume of sales were not sufficient to prove secondary meaning.  Order at 6.  Significantly, although P&P and Wallace were asked in discovery about the volume of P&P's sales, P&P and its expert (who improperly failed to recognize in his Report that length of use and sales revenue were both relevant legal factors for determining secondary meaning) (Rept. at 21), Wallace never discussed either P&P's short 10-month length of use or limited sales in his

Report.[1]  At his deposition, Wallace testified for the first time that P&P had earned ■■■ ■■■■■■■ for the first 10-months of sales.  *Id.*

10.    In this case, it appears that P&P knew that it could not prove secondary meaning if it had sued Johnson earlier at the time it discovered Johnson was selling his Game in January 2018.  Instead, by waiting to file suit for ***15-months*** after it learned that Johnson was selling his allegedly infringing product (and ***18-months*** after Johnson first sold it), P&P apparently thought it could benefit from delay be being able to rely upon a significantly longer period of use (*i.e., **over 2 years***) rather than the ***10-months*** this Court held (like *Converse)* was the relevant time period for determining secondary meaning (*i.e.,* on or before Johnson's first allegedly infringing use).  In the end, P&P produced sales revenue ***through April 2020*** (which P&P listed on its trial Exhibit List as Exhibits 73 and 74) ***which reflected sales over a year after this lawsuit***.  By doing so, P&P apparently thought it could convince this Court P&P had earned a significantly larger amount of revenue from the sale of its Game ***a year after filing suit*** (■■■■■■■■■ ■■■■■■■■■■■■).  In fact, Wallace confirmed at his deposition he thought P&P earned well in excess of ■■■■■■ from the sale of its Game if P&P included sales revenue through ***April 2020 – over one year after this lawsuit was filed in March 2019. Wallace Depo. at 32.***  A copy of transcript from June 22, 2020 deposition of Robert Wallace is being separately lodged with the Court with this Motion for the Court's review.  ***While P&P also could have retained Wallace or another expert to conduct surveys shortly after discovering Johnson was allegedly selling an infringing product in January 2018 (15-months earlier), it instead waited a full year after this lawsuit was filed (nearly two and one-half years after Johnson first sold its product) before conducting any survey***.  By delaying for this extended period of time, P&P apparently

---

[1] In fact, during discovery, as discussed below, despite Wallace's failure to consider either of these factors, including P&P's short "ten months of sales and concerns" and "the length, market, and exclusive use of the trade dress" as relevant factors for determining secondary meaning, P&P itself listed these factors (like the Court) as relevant for proving secondary meaning.  *See* para. 13 below.  Thus, there was not even consistency between P&P and its own expert in their legal positions.

concluded it could obtain more favorable survey evidence to prove secondary meaning and likelihood of confusion by delay, particularly where Wallace's surveys were conducted under dramatically different market conditions with a much longer product history and a larger amount of sales by conducting surveys *a year after the lawsuit was filed*.  This strategy obviously did not work as the Court ultimately ruled that proof of secondary meaning was limited to a *10-month period of use* which should only include sales and other activities as of the date of Johnson's first alleged infringing use.  *Order at 6.  The law also clearly provides that a party cannot include or rely upon purported evidence (like sales data, time of use and advertising) after the date of Johnson's allegedly infringing use.*  *See* Johnson's *Motion in Limine* No. 5 (Dkt. No. 92) and authority cited therein at 10-14.  *See also* Order at 6 ("Whatever questions may exist about advertising and intentional copying, they do not rise above the level of a scintilla of evidence and fail to raise a genuine issue of material fact").

## III.    P&P'S  LITIGATION MISCONDUCT

11.    During discovery, P&P never provided factual or legal support for its claims in this lawsuit.  *Johnson had to spend over 16-months litigating this case between the time it was filed on March 15, 2019 until this Court granted Summary Judgment on July 28, 2020 (Dkt. No. 119)*.  It continues to litigate because P&P has now recently filed a Motion for Reconsideration (Dkt. No. 121-1 filed August 10, 2020) and in preparing and filing this Motion.  During this lengthy period of time, *Johnson has now spent well over $600,000 to date* defending this action.  Among other work performed during this extended period of time, Johnson served multiple discovery requests on P&P trying to determine what factual and legal support P&P had for its claims.  This included, Johnson's First Set of Interrogatories dated June 7, 2019 ("Interrogatories"); (ii) First Set of Request for Admissions dated June 7, 2019 ("RFA's") and (iii) First Set of Requests for Production of Documents and Things dated June 7, 2019 ("RFPs").  *See* Doroshow Decl. filed June 4, 2020 in Support of Motion for Judgment on the Pleadings and for Summary Judgment (Dkt. No. 59) at 5, Exhs. A-C.  Johnson also conducted P&P's *Rule*

*30(b)(6)* on February 10, 2020, ***8-months after serving its written discovery and two months before the close of discovery***.  A copy of the transcript from P&P's *Rule 30(b)(6)* deposition is being separately lodged with the Court with this Motion for the Court's review.  P&P's three responses to Johnson's Interrogatories over the course of over a year are attached here to as Exhibits D, E and F for the Court's review.

    12.    Prior to the discovery cut-off, Johnson spent over a year trying to obtain relevant information and documents from P&P.  P&P's Responses to Johnson's Interrogatories (***which P&P supplemented three times including on the last day of discovery***) ended up being largely meaningless and demonstrated P&P had no evidence to support its claims. For example, in responding to Johnson's Interrogatories Johnson asked P&P to identify the specific elements of its alleged trade dress and how Johnson allegedly infringed P&P's asserted trade dress.  ***In response, P&P simply repeated the description of its trade dress on alleged in P&P's Complaint and claimed that it was only the "total, overall impression of the trade dress" that was to be tested***. *See e.g.,* Resps. to Int. No. 1 and 7.  ***Similarly, when asked to identify the specific element of Johnson's product that allegedly infringed P&P's alleged trade dress, P&P again simply repeated that it was the "total overall impression of the [Johnson] products" that was confusingly similar to the asserted trade dress.*** *Id.* at Resp. to Int. No. 3.  Thus, P&P never explained what specific elements of P&P's asserted trade dress P&P believed Johnson infringed other than state that it was "total impression" of the Johnson product that infringed.  This, of course, was directly contrary to law, including this Court's opinion in the *Festival Trading* case, a case in which P&P itself was again the plaintiff ***that required P&P to explain the specific individual elements of its alleged trade dress.*** *See P and P Imports, LLC v. Festival Trading, Inc.*, Case No. 17-cv-01541 (JCG *)(2018)* (*"Festival Trading"*) (where this Court dismissed P&P's trade dress claim ruling that "[i]n order to determine Plaintiff's trade dress, one must first apprise herself of the elements of the trade dress"). *Id at 14.*

DECLARATION OF JAMES E. DOROSHOW

113201626.v1

13.    At the same time, when Johnson asked what elements of P&P's Game were distinctive, arbitrary and/or had acquired secondary meaning, after improperly objecting on the grounds that this Interrogatory *called for a legal conclusion*, P&P repeated that it was the "total overall impression" of the product that had to be examined and again merely repeated verbatim the definition of its alleged trade dress found in its Complaint. It then added: "While discovery is ongoing, it is anticipated that [P&P] will present expert witness opinion testimony on the secondary meaning [of its asserted trade dress as used in its Game] including survey evidence, the degree and manner of use, the exclusivity of use, the amount of advertising and media coverage, the amount of sales and number of customers, the established place in the market, and evidence of intentional copying or implied copying…." *See* P&P Resp. to Int. 4. ***Thus, no factual information was ever provided by P&P to Johnson during fact discovery because P&P merely parroted some of the relevant factors Court's evaluate in determining secondary meaning without ever providing what facts P&P believed proved any of these factors and by stating that Johnson would be provided with this information in expert discovery after the close of fact discovery.*** *See also* P&P Resp. to Int. No. 13 (stating that a discovery request asking for facts to prove secondary meaning or distinctiveness "prematurely calls for expert testimony," and that an expert would later provide expert testimony as to the "inherent distinctiveness and/or the secondary meaning" of its asserted trade dress ***after fact discovery closed)***. ***Thus, Johnson was never provided with factual information on distinctness or secondary meaning during fact discovery.***

14.    Johnson also asked P&P to explain what facts it had to show confusion in the market place. *See* Interrogatory 8. P&P again objected on the grounds that this Interrogatory ***called for a legal conclusion***, and added that this Interrogatory was vague, would require speculation, and remarkably would "***constitute an unwarranted invasion of both P&P's and the affected person's constitutional, statutory and common-law rights of privacy and confidentiality." P&P then invoked FRCP Rule 33(d) and referred to a set of documents that merely included P&P's sales documents. As***

9

*discussed below, even though P&P's Rule 30(b)(6) witness (Peter Tanoury) verified P&P's Interrogatory responses, he later testified at his deposition he had no idea why P&P's own sales documents might possibly demonstrate confusion*. *See* P&P *Rule 30(b)(6)* Deposition Tr. at 167-168. ***Thus, P&P never demonstrated during fact discovery it had any proof of confusion.  In fact, Tanoury testified P&P had no proof that any third person had ever been confused as to the source of P&P's product or associated P&P with Johnson or any of its products.*** *See* Johnson's Separate Statement of Undisputed Facts at ¶¶ 12-13.

15.     Johnson also asked about P&P's advertisement of its Game.  *See* e.g., Int. No. 9. ***To this day, P&P has never stated what amount of money it budgeted or spent advertising its product.*** *See also* Int. No. 16 and P&P's Resp. thereto.

16.     Johnson also asked P&P to state what market share it and others had for P&P's Game product.  Int. No. 10. This was particularly significant because P&P's expert Wallace (while conceding he had no actual data to support his position) *later claimed that it was his "perception" that P&P's* ██████████ *represented a "fairly significant percentage of all of the four-in-a-row yard game sales sold at that period of time."* Wallace Dep. at 80 (*emphasis supplied*).  ***Yet, P&P never answered Johnson's Interrogatory asking about P&P's market share during fact discovery. Instead, it merely responded it "has advertised and sold [its products] in this market and through retailers…"*** *See* Resp. to Int. No. 10.  ***Thus, Johnson was again never given any factual information on P&P's market share or information to test P&P's expert's opinion by the time fact discovery closed.***

17.     Johnson also asked P&P, among others, to state the profits earned on the products it had sold, and how such profits were calculated.  *See* Int. No. 10 at para. (h). Again, P&P referred Johnson to a series of documents under *Rule 33(d)*, ***none of which showed profits or how they were calculated.***  See *id.* (P&P Resp.).  Similarly, in Interrogatory No. 12 Johnson asked P&P to state the amount of damages it claimed it had suffered, and the factual and legal grounds for its damage claims.  ***Again, no facts were***

10

DECLARATION OF JAMES E. DOROSHOW

*provided by P&P*.  P&P merely provided reference to general categories of damages it thought it might be obtained and "ascertained through discovery and proven at trial, plus applicable interest" such as general categories like "Johnson's total profits and enhanced damages." P&P then added: "The final amount of P&P's damages has yet to be ascertained. Discovery is continuing." *Id.*, P&P Resp. to. Int. 12.  Despite these assertions, P&P never explained its profits or claimed damages in discovery, including in fact or expert discovery.  ***In fact, while repeatedly representing it would have a damage expert eventually address P&P's damage claims, P&P never designated a damage expert to do so***.  *See* Johnson *Motion in Limine* No. 2 (Dkt 93) discussing these subjects in greater detail.  At the same time, P&P's *Rule 30(b)(6)* deponent testified when asked about P&P's profits that it would "***need a forensic accountant to figure this out***." *See Rule 30(b)(6)* Depo. at 18 (*emphasis added*).  ***Despite repeatedly stated it would retain a damage expert, P&P never did so.  Thus, at the close of discovery and at the time of trial, Johnson still had never been provided with any information about P&P's claimed damages or how they were calculated.***  *See also* Int. No. 18 and Resp. thereto.  P&P's failure to provide any information on claimed damages prior to trial required Johnson to prepare an additional *Motion in Limine* (No. 2) (Dkt No. 93) to preclude P&P from testifying on the subject of damages at trial at further expense to Johnson.[2]

18.    Similarly, to determine what facts P&P had to meet its burden of proving that its Game was nonfunctional, P&P was asked to address this subject in Johnson's Interrogatories.  *See* Int. No. 14 and P&P's Resp. thereto.  P&P again did the same thing it did with Johnson's Interrogatories asking about what proof P&P had to show secondary meaning, ***i.e., it simply listed the legal factors courts consider in evaluating***

---

[2] While never providing any proof of damages or how they were calculated, in opposing Johnson's *Motion in Limine* No. 2 (Dkt. 93), P&P argued after the close of discovery that both Johnson's and P&P's deposition testimony could somehow prove P&P's claim of damages and that a lay witness could provide it.  *See* P&P Opposition to Johnson's *Motion in Limine* No. 2 (Dkt. No. 103 at 3-6.)  Apparently, P&P believes it can provide information for the first time after the close of discovery in opposing a *Motion in Limine* but never provide requested information as it was required to do in its Initial Disclosures or in its responses to written discovery as Johnson requested and the law requires.

113201626.v1

***functionality without providing any facts P&P might rely upon to prove***

***nonfunctionality***.  In the end, this Court determined that P&P's Game's trade dress was merely the colors of the white backboard and red and blue chips without evidence to the contrary.  *See* Order at 5 ("**Ignoring the functional aspects of the P&P Game's design**, the alleged trade dress consists of a "flat-white colored square board with evenly spaced round-hole cut-outs…contrasted with the smooth, circular flat-red and flat-blue featureless chips games pieces." Citing Compl. at 17 (emphasis supplied).  *See* also Summary Judgment Memo. (Dkt. No. 59) at 3-6 discussing the functional elements of P&P's asserted trade dress.

19.    On February 10, 2020, ***8-months after serving its written discovery and two-months before the fact discovery cut-off date***, Johnson conducted the *Rule 30(b)(6)* deposition of P&P to again try to determine if P&P had any factual or legal support for its claims, including any facts or legal authority P&P failed to provide in response to Johnson's written discovery.  A copy of the transcript of P&P's *Rule 30(b)(6)* deposition is being lodged with this Court with this Motion for the Court's review.  P&P designated Peter Tanoury ("Tanoury") to appear as its corporate representative at the deposition, one of the founders and owners of P&P and the same individual who had verified P&P's discovery written discovery responses (Dep. at 81) . Under *Rule 30(b)(6)*, "[t]he person designated must testify about information known or reasonably available to the organization."  By law, the organization must also educate the witness on the requested topics set forth in the deposition notice so that the witness can testify as to the organization's knowledge, not to be confused with the witness's knowledge on the subject. A copy of Johnson's *Rule 30(b)(6)* Depo. Notice is attached hereto as Exhibit G.

20.    During the P&P's *Rule 30(b)(6)* deposition a number of things became clear: (i) P&P had no support (legal or factually) for its claims; (ii) Tanoury lacked knowledge sufficient to testify about a number of noticed topics; and (iii) P&P had failed to answer fully a number of Interrogatories about subjects Tanoury testified he knew about before are at his deposition.  At the outset of his deposition, Tanoury was asked whether he had

12

113201626.v1

read Johnson's Deposition Notice, the topics listed in it and whether he was the most knowledgeable person to testify on P&P's behalf. In each instance, he answered in the affirmative. *See* Depo. Tr. at 5-8. In addition, in P&P's Initial Disclosures dated June 7, 2019 (at 2, para. 2) and in P&P's Interrogatory Responses (Int. No. 17 at 2), Tanoury had been listed as a material witness with a broad range of knowledge including someone who had "information regarding all claims and defenses;" the "overall appearance of" P&P's Game at issue in the Complaint" (which Tanoury testified he had read before it was filed and was accurate) (Depo. at 89-90); the "individual features" of P&P's Game (such as the "size, shape, and color of the components") (which as noted, P&P failed to explain in responding to P&P's written discovery); statements made by P&P and P&P's authorized retailers; the "promotion, advertising, and sale" of P&P's Game; the reputation of P&P and its Game and public recognition of P&P's trade dress; the consequences and damages to P&P from Johnson's alleged infringement (which P&P again failed to explain in responding to P&P's Interrogatories); Johnson's allegedly false or misleading statements and representations; and information concerning the "promotion, advertising and sale" of Johnson's product as accused in the Complaint, including the overall appearance, individual features, retail sales listing, and packaging of Johnson's Game (which again were among the subjects that P&P never answered when Johnson asked about them in Johnson Interrogatories as shown above).

21.    Despite Tanoury's claimed knowledge and his designation as the most knowledgeable witness to testify on P&P's behalf, in the end, Tanoury testified he had no knowledge about a number of noticed topics at his deposition, including: (i) the number of products P&P sold (despite P&P's allegations in its Complaint that it had created "nearly 350 products to date") (Complaint at 11) (*id*. at 9); (ii) what amount of growth P&P attributed to the sale of its Game which is the subject of P&P's Complaint and that is the subject of this lawsuit (*id*. at 20); (iii) when P&P's "GoSport's" trademark was registered and how long it had been used (*id*. at 22, 150); (iv) despite P&P's allegation in its Complaint that it protects its products through patents (Compl. at 12) , Tanoury

DECLARATION OF JAMES E. DOROSHOW

testified he didn't know about the identity of any particular patent, whether any patents
had been assigned to P&P, the patent numbers it owned, or why P&P didn't apply for a
patent for the Game that is the subject of this lawsuit ( *id*. at 24-27); (v) who created
P&P's website or whether P&P's Game was even on P&P's website (*id*. at 30-31); (vi)
despite P&P's admission that it never communicated with Johnson before filing this
lawsuit, Tanoury testified he was "not sure" this was the case (*id*. at 37); (vii) Tanoury
didn't know the amount of revenue P&P had obtained from selling different colored
coins other than the red and blue colors alleged as part of trade dress (*id*. at 42); (viii)
Tanoury couldn't say whether the brown version of P&P's Game had the same size or
configuration as P&P's White Game, or whether P&P had different versions of the
Brown Game (*id*. at 43); (ix) Tanoury couldn't testify as to the colors of P&P's carrying
case (*id*. at 55); (x) Tanoury didn't know what a witness (Shen) (Johnson's manufacturer)
"knew or didn't know" despite P&P's listing Shen as a material witness who allegedly
knew that Johnson copied P&P's Game (*id*. at 81); (xi) Johnson couldn't testify when
P&P had stopped working with Shen, when Shen started manufacturing Johnson's
product or whether anyone from P&P had ever spoken to Shen (*id*. 85-87); (xii) Tanoury
didn't know the number of other lawsuits P&P had filed (*id*. 91-92); (xiii) Tanoury could
not testify as to P&P's profits from the sale of its Game (*id*. at 102-103, 181) (saying
P&P needed "a forensic accountant to figure this out") (even though P&P never
designated a damage expert in this case despite repeatedly representing it would do so);
(xiv) Tanoury didn't know what Amazon did with the allowance P&P gave Amazon
under the parties' Promotional Allowance Agreements even though P&P claimed these
Agreements allegedly showed P&P's advertising expenditures; (xv) Tanoury did not
know what Amazon did with its allowance, including whether it ever even used it to
advertise P&P's products (*id*. at 103); (xvi) Tanoury couldn't say whether the CF-3
version of P&P's Game was the only product P&P claimed infringed P&P's alleged trade
dress or was the product for which P&P sought damages (*id*. at 106); (xvii) Tanoury
couldn't testify about how, whether or when P&P emphasized its alleged trade dress or

14

113201626.v1

simply relied upon its "GoSports" trademark to promote its product (*id*. at 114); (xviii) Tanoury couldn't say the amount P&P had spent on advertising at any period of time (*id*. at 116); (xix) while claiming that P&P's sales prices had decreased after Johnson entered the market, Tanoury couldn't say if this was even caused by or attributable to Johnson or his product (*id*. at 120); (xx) Tanoury didn't know if products shipped by P&P had carrying cases (*id*. at 130); (xxi) Tanoury didn't know why P&P used its own sales data to purportedly show confusion in the marketplace (*id*. at 167); (xxii) Tanoury couldn't testify about the specific amount of revenue P&P had obtained from the sale of the CF-3 version of its Game (*id*. at 179); and (xxiii) Tanoury couldn't testify as to P&P's percentage of revenue earned from the sale of P&P's CF-3 Game (*id*. 210-211).

22.   Similarly, despite claiming in its Complaint and the Wallace Report that P&P's trade dress was not functional, it was established at Tanoury's *Rule 30(b)(6)* deposition, as this Court itself ruled (Order at 5) that, apart from the colors used in its Game, all other elements in P&P's alleged trade dress were functional and commonly used in other four-in-a-row Games. *See* Johnson Summary Judgment Motion at 3-6. This of course proved that P&P could not prove one of the essential elements of its claim, *i.e.,* nonfuntionality.  As the above referenced testimony also showed, P&P could not and did not offer any support or explanation for its damage claims because Tanoury said he was not a damage expert, and was not qualified to provide opinion on this subject. *See also* Motion in Limine *No. 2 (Dkt. No. 93) for a further discussion of this subject, which Johnson again had to prepare and file at additional expense to him because of P&P's claimed ignorance of its damages as part of fact discovery.

23.   In terms of secondary meaning and likelihood of confusion, P&P again relied almost exclusively on the Expert Report of Robert Wallace (which this Court characterized in its Order as "almost entirely irrelevant" to show secondary meaning, and "does not help Plaintiff to meet its burden to show that the trade dress has become associated with Plaintiff itself"). *See* Order at p. 5.  As shown further below, there was

DECLARATION OF JAMES E. DOROSHOW

no factual support for many of Wallace's opinions because P&P failed to provide them in fact discovery.

24.    ***P&P also tried to blindside Johnson with fact discovery on the last day of fact discovery (i.e., April 30, 2020),*** a copy of an April 30, 2020 email from P&P's counsel to Johnson's counsel serving P&P's Third Amended Responses and Supplemental Document Production is attached hereto as Exhibit H.  As P&P knew, Johnson would not have the opportunity to question P&P or any fact witness about P&P's untimely supplemental discovery ***served on the last day of fact discovery***.  Nevertheless, P&P delayed serving supplemental discovery until the last day of fact discovery to try to obtain an unfair advantage in the lawsuit. ***The Wallace Report was also served on April 30, 2020, the last day of fact discovery***.  A copy of April 30, 2020 email from counsel serving Wallace Report is attached hereto as Exhibit I. ***On April 30, 2020, the last day of fact discovery, a year after Johnson served its written discovery requests, and two-months after Johnson had taken P&P's Rule 30(b)(6) deposition, P&P served Johnson with Third Amended Interrogatory Responses and a Supplemental Document Production consisting of 2,661 pages of newly produced documents amounting to nearly 40% of P&P's entire document production***.  As it did before filing this lawsuit, P&P tried to capitalize on delay in this instance by depriving Johnson of its lawful right to obtain relevant information and documents in fact discovery to adequately defend this case and prepare for trial.  P&P's delay amounted to nothing more than an 'end run' by a party who produced new evidence and identified new witnesses for the first time ***at the end of the discovery period, which severely prejudiced Johnson.***  In this instance, as P&P well knew, by serving this supplemental discovery ***on the last day of discovery and after Johnson had already conducted P&P's Rule 30(b)(6) deposition two months earlier***, ***Johnson was deprived of the opportunity to question any fact witness about P&P's untimely supplemental discovery responses and supplemental document production prior to trial.***  *See* Johnson *Motion in Limine* No. 4 (Dkt No. 96) for a more complete discussion of this subject and its impact on Johnson.  This also required

16

DECLARATION OF JAMES E. DOROSHOW

Johnson to again spend a large amount of money to address this subject. *See Motion in Limine* No. 4 (Dkt. No. 96).[3]

25.    Knowing full well that fact discovery was closed, P&P then disclosed information and documents ***for the first time it relied upon in opposing Johnson's Summary Judgement Motion that were also found in the Wallace Report. This information and document were specifically requested during fact discovery but never provided by P&P until the close of fact discovery***. At the same time, Wallace's Report and subsequent deposition testimony consistently contradicted P&P's discovery responses and the limited information P&P had provided in fact discovery. In his deposition, Wallace also repeatedly demonstrated his lack of knowledge about the underlying fact record. Significantly, P&P knew it had no factual support from any fact witness to oppose Johnson's Summary Judgment Motion. ***In fact, it never submitted a declaration from any fact witness (including Tanoury or anyone else) in opposing Johnson's Summary Johnson Motion. Instead, it relied almost exclusively on Wallace (who was not a fact witness) to oppose Johnson's Motion.***

26.    Contrary to what the law allows an expert to do, ***Wallace attempted to supplement the factual record in his Report after the close of fact discovery as if he was a fact witness.*** Numerous examples of Wallace's attempt to improperly supplement the fact record appear in his Report and his deposition taken on June 22, 2020. As shown in his Report and deposition, while failing to acknowledge his Report that time of use and amount of sales and customers were significant factors as the law provides, Wallace

---

[3] As part of eleventh-hour discovery responses, P&P also disclosed for the first time a new witness (Kaley Pringle-Haymons) it might rely upon at trial. *See Johnson Motion in Limine* No. 3 (Dkt. 95-1 at 3). As part of fact discovery, ***Johnson specifically asked P&P to identify all witness it thought might have relevant information.*** *See id.*, Int. No. 17. ***Pringle-Haymons was never identified by P&P in response to any of Johnson's discovery***. This, however, didn't concern P&P. In opposing Johnson's Motion to exclude Pringle-Haymons from testifying at trial, P&P argued it had no duty to list "potential trial rebuttal witness" before trial and Pringle-Haymons should therefore be allowed to testify. *See* Opp. (Dkt. No. 104 at 3). Thus, according to P&P, even though Johnson specifically asked P&P to list all fact witness during discovery, it had no obligation to list Pringle-Haymons in its discovery responses since she would only be a rebuttal witness at trial. This is obviously not the law and P&P knew (or should have known) it. P&P's Opposition was frivolous.

testified for the first time that ***P&P had*** ██████████ ***from the sale of its product before Johnson first sold its product (i.e., during this ten months period from December 2016 through October 2017)***. *See* Wallace Depo. Tr. at 29. Wallace also testified about P&P's total sales from the sale of its Game (including sales ***after*** Johnson entered the market) (***from what he had said he learned from P&P's counsel) which exceeded*** ██████████ ***if it included sales after the date this lawsuit was filed (a year earlier)***. *Id.* at 32. For its part, ***P&P never disclosed these facts in discovery***, including its revenues or profits from the sale of its Game either before or after Johnson entered the market. *See* Interrogatory No. 10 and Response thereto.

27.    Wallace also testified that he believed that the Relevant Date for determining secondary meaning was ***at the time the lawsuit was filed in March 2019*** (*id.* at 34) (which is contrary to this Court's Order and controlling legal authority like *Converse* and Ninth Circuit authority). This was also inconsistent with P&P's position as P&P produced and listed as trial exhibits sales data and advertising ***as late as a year after the lawsuit was filed***.

28.    ***Significantly, there were a number of facts that Wallace also testified he was unaware of when he prepared his Report***. For example, he testified he knew nothing about P&P's ***15-month delay*** before suing Johnson. *Id.* at 38. At the same time, he ***speculated*** that he thought secondary meaning "might" already have been established before Johnson entered the market because in his opinion there were "very high sales" the first year P&P sold its product even though there had ██████████ in sales during this initial ten-month period of use. For its part, ***P&P never made this assertion in discovery***. Even though time of use is an important factor for determining secondary meaning, Wallace also never mentioned in his Report the short period of time (*i.e.,* ten-months) P&P had sold its product before Johnson's first allegedly infringing use. *Id*. at 79. Wallace also testified that he believed P&P had spent 8% of its revenue in advertising before filing suit, and spent money for "pay for click." *Id.* at 50-53. ***Again, this information was never disclosed by P&P in fact discovery***. Wallace also testified

that he believed P&P had been the exclusive seller up to the time suit was filed, ***even though P&P never made any such assertion in responding to Johnson's Summary Judgement Motion or in discovery***. *Id.* at 42.  In fact, Wallace failed to address the fact that Johnson had been allowed to sell an allegedly infringing product for 15-months before P&P sued him.  Therefore, P&P could not possibly have been the exclusive seller up to the time of suit as Wallace mistakenly testified. *Id.* at 42.

29.     Wallace also testified that he was unaware that other companies sold red and blue playing chips even though he claimed that he had reviewed Tanoury's deposition transcript where Tanoury confirmed this was in fact the case.  *Id.* at 62-63.  At the same time, Wallace confirmed that he did not know that P&P was offering for sale different colored coins or Brown Game boards. *Id.* at 63-64.  He also didn't know that Hasboro had been selling a Connect Four Game for over 40-years before P&P did so.  *Id.* at 66.  These subjects were also all addressed in P&P's *Rule 30(b)(6)* deposition Wallace stated he had read and relied upon for purposes of preparing his Report.

30.     ***Even though P&P never made a similar assertion in fact discovery***, Wallace also testified that ▮▮▮▮▮▮ in sales the first 10-months after introducing a product was "probably" a "fairly significant percentage" of all four-in-a-row game sales at this period of time.  ***Yet he testified that he had not researched the issue or had any data to support it.  Rather, this was merely his "perception." Id.* at p. 83*.  At the same time, even though P&P was specifically asked to state its market share in Johnson's Interrogatories (Exh. No. 10), P&P never made this assertion in fact discovery that Wallace offered for the first time at his deposition.***

31.     Wallace also testified that he thought P&P's trade dress was "prominently displayed" when promoted (*id.* at 110).  ***Yet, P&P again never made this assertion in fact discovery***.  Other examples of how Wallace contradicted or tried to improperly supplement the fact record in this case are also discussed in Johnson's *Motion in Limine* No. 1 at 13-14 (Dkt. No. 90).  This again cost Johnson a significant amount of money to prepare and file his *Motion in Limine*.

DECLARATION OF JAMES E. DOROSHOW
113201626.v1

32.    Wallace's Expert Report also offered for the first time additional information and data *P&P never disclosed in fact discovery*.  A copy of Wallace's Expert Report is attached hereto as Exhibit J.  For example, even though P&P was specifically asked in Johnson's Interrogatories to state why it believed its product was not functional, in his Report (at p. 6-11) Wallace offered *for the first time images of a number of products P&P never disclosed in discovery*.  In doing so, Wallace claimed those products were different from the P&P Game design and concluded "[i]t is my understanding that these games were introduced after each of the products at issue here." *Id.* at 11, n. 2.  Leaving aside the lack of relevancy of products that post-dated the first sale of Johnson's product, the new "facts" and opinions offered by Wallace in this section of his Report *were never addressed by P&P in responding to Johnson's discovery even though Johnson had specifically asked about this subject.*

33.    Similarly, although P&P was specifically asked about its advertising during fact discovery, Wallace devoted an four-page section of his Report (13-16) to "advertisement" that discloses *for the first time factual information never disclosed by P&P in fact discovery.*  According to Wallace, he relied upon an informal April 28, 2020 interview *(before the close of fact discovery)* with Peter Engler and Peter Tanoury (P&P's *Rule 30(b)(6)* deposition deponent) for this information. *See* Report at 13-16.  Obviously, if P&P's owners could impart information to Wallace never disclosed to Johnson in fact discovery, P&P certainly could have given Johnson the same information in responding to Johnson's written discovery or at P&P's *Rule 30(b)(6)* deposition.  P&P never did so – *demonstrating again P&P deliberately withheld relevant information from Johnson in fact discovery*.

34.    Wallace also devotes an entire section of his Report to "Demonstrated Utility." *Id.* at 16.  *Again, this discussion and the information stated in it were never provided by P&P in fact discovery*.  No dates are even provided by Wallace to determine whether the activity he alleges occurred take place before Johnson entered the market, and thus the entire discussion is irrelevant in any event since it postdates Johnson's first

20

use.  Other information, facts and topics found in the Wallace Report appear for the first time *even though were never fully discussed in P&P's discovery responses or at its Rule 30(b)(6) deposition.*  They include alleged exclusivity of use; copying; proximity of goods; marketing channels used; type of goods and the degree of care likely to be exercised by the purchaser; defendant's intent in selecting the mark; or likelihood of expansion of the product lines. *Id.* at pp. 17-27.  In fact, in the end, all that P&P did in its Third Amended Interrogatory Responses served on April 30, 2020 (*the last day of discovery*) was reference the Wallace Report and the parties' *Rule 30(b)(6)* depositions *as a whole without even stating where responsive information could be found in them, or even summarizing it*.

35.    P&P also lacked legal support for its claims in this lawsuit from the outset.  This started with P&P's Complaint.  For example, as shown in Johnson's Summary Judgment Motion, P&P failed to define the specific elements of its alleged trade dress, as this Court had previously ruled was necessary in *Festival Trading, Inc.*, Case No. CV 17-1541-DOC (JCG) (2018).  *See* Compl. at 17.  P&P also alleged in its Complaint that its Game design was inherently "distinctive" even though it have never been registered, and the United States Supreme Court ruled in *Qualitex Co. v. Jacobson Products Co.*, 514 U.S. 159 (1995) and *Wal-Mart Stores, Inc. v. Samara Brothers, Inc.* 529 U.S. 205 (2000) *that in cases like this involving product descriptions and colors no mark could ever be inherently distinctive, and proof of secondary meaning was therefore necessary.*  *See also* Decl. at 5.

36.    In addition, P&P consistently ignored, contradicted and misconstrued legal authority, including the Relevant Date for proving secondary meaning which Federal Circuit and Ninth Circuit authority clearly held P&P had to establish "before the first infringing use" by Johnson (*i.e.*, October 2017).  *See Converse, Inc. v. International Trade Commission*, 909 F.3d 1110, 1116 (Fed. Cir. 2018); *Braun, Inc. v. Dynamics Corp. of Am.*, 975 F.2d 815, 825 (Fed. Cir. 1992) (holding that "[a] claim of trade infringement fails if secondary meaning did not infringement exist before the infringement began" and

DECLARATION OF JAMES E. DOROSHOW

113201626.v1

placing the burden of proof on the plaintiff); *Levi Strauss & Co. v. Blue Bell Inc.*, 778 F.2d 1352, 1359 (9th Cir. 1985); *Solofill, LLC v. Rivera*, 2018 WL 6038287, *6 (C.D. Cal. August 3, 2018); *Network Automation, Inc. v. Hewlett Packard Co.* 2009 WL 5908719, *6 C.D.Cal. September 14, 2009). *See also* 2 *McCarthy* on *Trademarks and Unfair Competition Section 16:34* ("If the senior user cannot prove that its mark possessed secondary meaning at time the defendant commenced its use, there can be no infringement."). Despite this controlling legal authority, P&P nevertheless initially argued that the "controlling law in the Ninth Circuit, *Art Attacks Ink, LLC v. MGA Entertainment Inc.*, 581 F.3d 1138 (9th Cir. 2009), recited no such requirement." *See* P&P Opp. to Summary Judgment Motion (Dkt. 71 at p. 19). Yet, P&P abandoned this "argument" in later filings. Thus, P&P's "argument" that there was reportedly no authority in the Ninth Circuit that supported *Converse* did not appear in P&P's *Motion in Limine* No. 4 (Dkt. 87), or its Opposition to Johnson's *Motions in Limine* Nos. 1 (Dkt. No. 100 at pp. 5-7) and 106 (Dkt. No. 106 at pp. 5-7) (proving that P&P never adequately researched the issue). At the same time, as shown above, ***P&P's expert (Wallace) didn't understand the law as he incorrectly testified that all that P&P had to prove was that secondary meaning existed as of the time that P&P's lawsuit was filed in March 2019. Thus, P&P and its expert didn't even know what the Relevant Date was for proving secondary meaning.***

37.    Ignoring controlling law and even the testimony of its own expert, P&P in fact produced sales revenue and designated it as trial exhibits through ***April 2020, i.e., over one year after this lawsuit was filed***. At the same time, it designated as trial exhibits Promotional Agreements with Amazon and other documents that post-dated the Relevant Date of October 2017 by years and, in general instances, well after this lawsuit was filed. *See e.g.,* P&P Tr. Exhibit 66. A copy of P&P Trial Exhibit 66 (excerpts) is attached hereto as Exhibit K. By law such documents could not of course possibly serve as evidence that P&P's had acquired secondary meaning when P&P must have established secondary meaning as of a date before the cited documents and related

information (which P&P should have known if it had properly researched this issue).  *See e.g., Burke-Parsons-Bowlby Corp. v. Appalachian Log Homes, Inc.*, 871 F.2d 590, 596 (6th Cir. 1989( (holding substantial sales irrelevant to secondary meaning where evidence failed to show that sales occurred prior to defendants' alleged infringement); *Bay State Sav. Bank v. Baystate Fin. Servs, LLC*, 484 F. Supp. 2d 205, 214-15 (D. Mass. 2007) (finding evidence of advertising and promotional efforts dated after defendant entered the market irrelevant); *Milbank Tweed Hadley & McCloy LLP v. Milbank Holding Corp.*, 2007 WL 1438114, *3 (C.D.Cal. February 23, 2007) (Kalusner, J.) (holding evidence between 1999 and 2006 irrelevant because the relevant period for showing secondary meaning was between 1999 and 2002); *Continental Lab. Prods., Inc. v. Meda Int'l Inc.*, 114 F.Supp. 2d 992, 1002 (S.D. Cal. 2000) (holding post-infringement sales and advertising activities had no legal relevance to whether plaintiff's design had obtained secondary meaning at the time of defendants' first allegedly infringing use).  This Court's Order was consistent with this law (holding that P&P use and sales should be evaluated for a ten-month period from December 2016 through October 2017).  Order at 10. Despite this clear governing legal authority, P&P and its expert ignored it thereby again forcing Johnson to incur the additional expense of preparing two *Motions in Limine* to obtain a ruling that post-infringement documents and information were irrelevant and could not be used at trial.  *See* Johnson *Motions in Limine* Nos. 1 and 5 (Dkt. Nos. 90 and 92).

38.    In terms of confusion, P&P also took unsupported legal positions.  For example, when asked whether there had been any actual confusion in the marketplace, P&P and its expert stated that there was actual confusion allegedly because one of P&P's owners (Tanoury) was allegedly confused.  *See e.g.,* Wallace Rept. at p. 19, par. G. Had P&P properly researched this issue and properly followed the law it was readily apparent that likelihood of confusion cannot be proven through the eyes of P&P's owner (Tanoury) but must be examined from the viewpoint of the ***ordinary consumer.***  *See* Johnson *Motion in Limine* No. 1 (Dkt. No. 90) and authority cited therein at p. 8.

Similarly, Wallace's efforts to try to show actual confusion based upon undated consumer calls from unidentified consumers to P&P's customer service representatives were clearly inadmissible since Tanoury could not even state whether the calls involved Johnson or any of its products. As such, they violated a simple rule of evidence, i.e., lack of a foundation for admissibility. *See id.* at pp. 22-24.

39.      As also shown above, Wallace also repeatedly attempted to improperly supplement the factual record, and frequently contradicted it. This too violates a number of governing legal principles. Under *Fed.R.Ev. 702,* an expert's opinion is admissible only if it is based "upon sufficient facts or data." *Id*. Accordingly, a court must exclude an expert's opinion if the facts of record contradict the expert's opinion or the opinion finds no support in the factual record. *See e.g., Guidroz-Brault v. Missouri Pac. R.R. Co.,* 245 F.3d 825, 830 (9th Cir. 2001) (affirming exclusion of expert opinion because it had "no support in the physical facts as described by the reports and other evidence in the record.") *See also* additional discussion and authority cited in Johnson's *Motion in Limine* No. 1 (Dkt. 90) at pp. 12-14. P&P again simply ignored this law.

40.      Despite *Converse*'s ruling that secondary meaning must prove "past perception" as of the date of the first infringing use, ***Wallace also testified that he never made any attempt to evaluate past perception***. Instead, Wallace testified at his deposition that his surveys only measured secondary meaning and likelihood of confusion "***as to the dates they were performed"—namely, March and April, 2020 two and one-half years after the Relevant Date***. Wallace Dep. at 105: 14-15 ("My surveys prove secondary meaning as to the dates they were performed."). *See also id.* at 105:14-107:10. Thus, Wallace again failed to follow the law as he made no effort to try to determine consumer perception as of the date of Johnson's first infringing use, *i.e.*, October 2017. *See* e.g. *Converse*, 909 F.3d at 1120.

41.      In his Report, Wallace also attempted to offer expert opinion on a number of subjects that he was not qualified or allowed to testify about, including: (i) damages and functionality; (ii) Johnson's alleged intent; and (iii) information within the common

DECLARATION OF JAMES E. DOROSHOW

113201626.v1

knowledge of the jurors (such as the similarity of the parties' products).  *See Johnson Motion in Limine* No. 1 and authority cited therein at 15-19.  Wallace (while falsely testifying at his deposition that he couldn't recall any of his reports being excluded) (*see* Depo. at 23-24), ***failed to mention that no less than two federal courts had previously excluded Wallace's opinions regarding likelihood of confusion and, in particular, his comparison of marks and/or trade dress, for the reason he was trying to improperly usurp the function of the jury that did not require or allow expert testimony just as he has attempted to do here.***  *See id.* at 18-19, citing  *Akiro, LLC v. House of Cheatham, Inc.*, 946 F. Supp.2d 324, 331-332 (S.D.N.Y. 2013) (ruling Wallace's opinions regarding the similarity of product packaging and whether consumers would likely confuse the brands inadmissible because Wallace "merely compare[d] the elements of the two brands in the same manner as would an ordinary lay juror"); *Patsy's Italian Rest., Inc. v. Banas*, 531 F. Supp.2d 483, 485 (E.D.N.Y. January 5, 2008) (precluding Wallace from testifying at trial about the issue of likelihood of confusion because the jury could easily make a comparison of the parties' marks without expert help).

42.    P&P also filed a number of *Motions in Limine* lacking any possible legal support. This again forced Johnson to oppose them at significant additional expense. For example, in Plaintiff's *Motion in Limine* No. 1 to Exclude Mischaracterization of Plaintiff's Trade Dress (Dkt. No 84), P&P tried to convince this Court that Johnson could not prove that P&P's alleged trade dress consisted of a red, white and blue color combination.  Yet, this as shown in Johnson's Summary Judgment Motion was fully supported by the record, including by P&P's *Rule 30(b)(6)* deposition. *See* Motion at 3-6. As reflected in this Court's Order this Court agreed with Johnson and ultimately determined that P&P's alleged trade dress consisted merely of this color combination (Order at 5) ("[i]gnoring the functional aspects of the P&P Game's design, the alleged trade dress consists of a flat-white colored square board with evenly spaced round-hole cut-outs…contrasted with the smooth, circular flat red and flat-blue featureless chip game pieces").  Citing Complaint at 17.  P&P of course had no grounds to preclude Johnson

DECLARATION OF JAMES E. DOROSHOW

from arguing that, apart from the functional aspects of its Game, that all the alleged trade dress consisted of was a red, white and blue color combination.  While P&P may not have wanted a jury to hear this, this was perfectly appropriate advocacy on the part of defense counsel and true exactly as this Court determined.  P&P's Motion was therefore entirely frivolous and should have never been filed.

43.     P&P also filed another *Motion in Limine* asking the Court to exclude all references to Plaintiff's other cases "Dealing with Unrelated Trade Dress." *Motion in Limine* No. 2 (Dkt. 85).  The purpose of this Motion was obvious, i.e., to try to exclude Johnson from proving that P&P was a litigation troll that indiscriminately sued multiple third parties after its founding in 2007 (*i.e.*, having filed 14-different lawsuit in this Judicial District alone since its formation), and still allow P&P to offer at trial evidence that it had entered into a Stipulated Judgment in a case involving the ***four-in-a-row Game that is the subject*** of this lawsuit in a case involving a different defendant (*i.e.,* Apple Tree ).  *Id.* While Johnson had to file a Motion to exclude references to P&P's other litigation (*Motion in Limine* No. 6) (Dkt. No. 94), P&P nevertheless wanted the Court to allow it to introduce evidence that it had settled a case where P&P had entered into a Stipulated Judgment involving the same trade dress that is the subject of this lawsuit as well as a favorable press release related to the Stipulated Judgment ***simply because it hoped a jury might mistakenly conclude from them that P&P had protectable trade dress for its asserted trade dress in this case***.  *See* P&P's Opposition to Johnson's *Motion in Limine* No. 6 (Dkt. No. 107).  In P&P's Opposition (*id.*), P&P agreed that the Stipulated Judgment in *Apple Tree* was not res judicata or collateral estoppel in this lawsuit (*id.* at 4). Nevertheless in P&P's words evidence of a Stipulated Judgment and a favorable press release was "probative evidence that a competitor [*i.e., Apple Tree*] recognized Plaintiff's trade dress as defined and that Plaintiff's use of the trade dress is valid and exclusive." *Id.* at p. 1.  P&P added "[t]he  *Apple Tree* Order is also probative evidence of, at least, the strength and ownership of Plaintiff's trade dress…" (*id.*).  Neither statement was or is supported by any legal authority and, as P&P well knows,

there is none.  In fact, if the Court were to allow the introduction of Stipulated Judgments and favorable press releases related to it, it would carve out inappropriate exceptions to the doctrines of res judicata and collateral estoppel and effectively eliminate these legal doctrines.  Again, this self-serving Motion had no legal support and was a complete waste of this Court's and Johnson's time (as well, in Johnson's case, his money).

44.    P&P also sought to prevent Johnson from arguing or explaining to the jury that there is a five-year period of time of use before a mark filed for registration could be presumed to have distinctiveness before the USPTO. *See Motion in Limine* No. 5 (Dkt. No. 88). Yet, this is exactly what the law provides. *See 15 U.S.C. Section 1052(f)* ("The Director may accept as prima facie evidence that the mark has become distinctive, as used on or in connection with the applicant's goods in commerce, proof of substantially exclusive and continuous use thereof as a mark by the applicant in commerce for the five years before the date on which the claim of distinctiveness if made.").  There is also legal authority that the statutory 5-year standard has probative value and should not be excluded as discussed in Johnson's Opposition to the Motion. (Motion No. 5 at 2) As *McCarthy* states at Section 15:54 at p. 15-111 "***the five-year presumption may be used by analogy as probative evidence of secondary meaning in litigation attempting to establish unregistered trademark or trade dress rights.***" *Id.* at 2. (emphasis supplied). What P&P was in fact trying to prove was that there is no specific period of time for a mark to acquire secondary meaning.  Yet, the law is not that all marks acquire secondary meaning simply by being used for a short period of time, but only in special circumstances (such as where there is a "massive advertising campaign"). *See e.g.*, *McCarthy, Vol. 2 at Section 15:55* (citations omitted).  P&P in fact never had proof of significant advertising here, but rather offered things like ***displaying its Game over the weekend in Orange County local beaches*** that are clearly insufficient to prove secondary meaning within a short ten-month period and, at the same time, without ever telling this Court the amount of money P&P had spent on advertising. (*See e.g.*, Wallace Rept. ("Mr. Engler further explained that Plaintiff conducted ***grass roots marketing*** by often setting

27

DECLARATION OF JAMES E. DOROSHOW

113201626.v1

up the GoSports game here at Orange County beaches on the weekends where it could be seen by large **crowds and beachgoers.**"). *Id.* at 13. (emphasis supplied) *See also* Wallace statement that: "Plaintiff…has needed to expend a [undefined] **significant sum of money** to maintain its sales after the Johnson game began marketing and selling its products and this has increase [sic] over time." ) (Rept. at 24) (emphasis supplied).  This Motion again was also not supported by legal authority and cost Johnson a large amount of money to oppose it.

45.    Finally, P&P opposed a number of Johnson's *Motions in Limine*, including those seeking to exclude late served Third Amended Interrogatory Responses and P&P's Supplemental Documents Production, and the identity of new trial witnesses, **which P&P served the last day of discovery when P&P knew fact discovery had closed and Johnson would have no opportunity to question anyone about P&P's delayed discovery.** *See* Johnson's *Motion in Limine* Nos. 3 and 4 (Dkt Nos. 95 and 96), and P&P's Opposition thereto (Dkt Nos. 104 and 105).   The law clearly prohibits these types of last-minute discovery tactics and P&P had absolutely no justification for its misconduct. Nor did P&P have any basis for opposing Johnson's Motion to Exclude Evidence of Damages (*Motion in Limine* No. 2) (Dkt. No. 93) given that P&P failed to provide any proof of damages in fact discovery and never designated a damage expert even though it repeatedly represented to Johnson that a damage expert would be retained.  This discovery abuse also cost Johnson a significant amount of time and money.

///

///

///

///

///

///

///

///

28

DECLARATION OF JAMES E. DOROSHOW

## IV.    JOHNSON'S REQUESTED LEGAL FEES AND COSTS ARE REASONABLE

46.    From March 2019 to August, 2020, Johnson has or will be billed $632,840 in legal fees and $7,412.30 in costs to date.  Notably, Johnson has actually paid for these legal costs and fees, with the exception of the most recent August bill which was just submitted.  This "adds weight to the presumption of reasonableness" since a sophisticated party, like Johnson, has shown that these fees and costs are reasonable through payment. *Stonebrae LP v. Toll Bros. Inc.*, 2011 WL 1334444, *6 (N.D. Cal. 2011).  These fees and costs can be broken down by particular timekeeper by the following screen shot of my firm's internal billing system.

///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///

DECLARATION OF JAMES E. DOROSHOW

113201626.v1

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|

**Billed Entries** ▾ | | | | | | Go |

Worked Date: From 04/01/2004 To 07/31/2020
Billed Date:
Invoice Number: | Image

| Initials | Timekeeper | Rate | Hours | Percent | Fees | Percent | Cost |
|---|---|---|---|---|---|---|---|
| 0605 | JONATHAN WINTERBOTTOM | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -6,436.75 |
| 1554 | JANINE A. DODDS | 355.00 | 2.00 | 0.13 | 710.00 | 0.11 | 0.00 |
| 1897 | JAMES DOROSHOW | 500.00 | 612.00 | 41.03 | 306,000.00 | 48.35 | 12,428.89 |
| 3041 | RASHAN ELEY | 200.00 | 0.70 | 0.05 | 140.00 | 0.02 | 0.00 |
| 3078 | JENNIE R. FRITH | 257.33 | 1.50 | 0.10 | 386.00 | 0.06 | 0.00 |
| 3186 | TINA WANG | 195.66 | 253.00 | 16.96 | 49,501.00 | 7.82 | 334.74 |
| 3394 | GINA DIETZ | 117.63 | 1.90 | 0.13 | 223.50 | 0.04 | 0.00 |
| 3756 | RYAN L. CONKLING | 250.00 | 0.30 | 0.02 | 75.00 | 0.01 | 0.00 |
| 3887 | ASHE P. PURI | 500.00 | 143.70 | 9.63 | 71,850.00 | 11.35 | 744.20 |
| 4104 | MELISSA E. SCOTT | 430.00 | 188.90 | 12.66 | 81,227.00 | 12.84 | 23.82 |
| 4331 | JAMES M. GOODING | 250.00 | 1.00 | 0.07 | 250.00 | 0.04 | 0.00 |
| 4383 | HEIDI A. O. FISHER | 500.00 | 11.00 | 0.74 | 5,500.00 | 0.87 | 0.00 |
| 4460 | STEPHEN H. OVERBY | 250.00 | 0.50 | 0.03 | 125.00 | 0.02 | 0.00 |
| 4686 | CONRAD B. WILTON | 400.00 | 28.70 | 1.92 | 11,480.00 | 1.81 | 0.00 |
| 4725 | WILLIAM PURDY | 250.00 | 0.50 | 0.03 | 125.00 | 0.02 | 0.00 |
| 4726 | DONNA MUNYER | 250.00 | 1.50 | 0.10 | 375.00 | 0.06 | 0.00 |
| 4858 | TOMMY CHOW | 229.17 | 2.40 | 0.16 | 550.00 | 0.09 | 0.00 |
| 4900 | ERIC C. BERG | 130.00 | 3.20 | 0.21 | 416.00 | 0.07 | 0.00 |
| 4913 | CHARLIE NELSON KEEVER | 345.88 | 11.90 | 0.80 | 4,116.00 | 0.65 | 0.00 |
| 4917 | RASHANDA BRUCE | 345.00 | 4.70 | 0.32 | 1,621.50 | 0.26 | 0.00 |
| 5143 | BRIANNE A. SCOTT | 130.00 | 2.10 | 0.14 | 273.00 | 0.04 | 0.00 |
| 5270 | JOSIE LEINART | 340.00 | 47.70 | 3.20 | 16,218.00 | 2.56 | 0.00 |
| 5961 | SARAH PENNEBAKER | 130.00 | 0.90 | 0.06 | 117.00 | 0.02 | 0.00 |
| 5976 | IMANI RASIFU | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 317.40 |
| 5995 | JONATHAN DAVIS | 251.43 | 7.00 | 0.47 | 1,760.00 | 0.28 | 0.00 |
| 6064 | JULIE BONO | 125.78 | 3.20 | 0.21 | 402.50 | 0.06 | 0.00 |
| 6092 | ROBERT MORELLO | 229.00 | 2.50 | 0.17 | 572.50 | 0.09 | 0.00 |
| 6093 | ESTHER CHEW | 250.53 | 1.90 | 0.13 | 476.00 | 0.08 | 0.00 |
| 6096 | HOWARD S. SUH | 500.00 | 156.50 | 10.49 | 78,250.00 | 12.36 | 0.00 |
| 6288 | CHRISTOPHER YI | 250.00 | 0.40 | 0.03 | 100.00 | 0.02 | 0.00 |
| | GRAND TOTAL  WORK: | | 1,505.20 | | 639,540.00 | | 7,412.30 |
| | GRAND TOTAL  BILL: | 424.27 | 1,491.60 | 100.00 | 632,840.00 | 100.00 | 7,412.30 |

47.     Of the attorneys and support staff working on this case, the top five individuals in terms of hours worked were me (who generated 41.03% of the hours billed), Ashe Puri (a former partner of the firm who billed 9.63% of the hours), Howard Suh (a partner who billed 10.49% of the time), Melissa Scott (a partner who billed 12.66% of the time), and Tina Wang, (a paralegal who generated 16.96% of the hours billed) (for a total of 90.77 %).[4]  As demonstrated below, the rates of the individuals who

---

[4] The titles of other individuals who worked on this case are as follows: Dodds, Janine A. (paralegal); Frith, Jennie R. (E-Discovery Technology Project Manager); Conkling, Ryan

DECLARATION OF JAMES E. DOROSHOW

113201626.v1

worked on this case were reasonable and well within the typical rates within the Central District of California. Moreover, the hours spent working on this case were also reasonable given the 16-months that this case has been pending, where the parties engaged in extensive summary judgment briefing which culminated in the Court's July 28, 2020 Order granting summary judgment in Johnson's favor - three weeks before the August 18, 2020 trial date, and after the parties submitted all of their papers for the Final Pretrial Conference, including six *Motion in Limine* (and oppositions) by each side, and an extensive Memorandum of Contention of Facts and Law, Proposed Final Pretrial Order and Exhibit List. *See* Dkt. Nos. 81-109.

48.    As the primary attorney who worked on the case, and lead trial partner, my billing rate was $500/hour. I graduated from Stanford Law School in 1979 and have been practicing law for more than 40-years. As a Senior Partner at my firm, Fox Rothschild LLP, I am typically the lead trial lawyer for all of my litigation cases which have numbered more than 200 over the years. A copy of my firm bio can be found at Exhibit L. I believe that my billing rate is substantially lower than the normal billing rate within the Central District of California for someone with my legal experience and position.

49.    For example, in the Court's Order Granting Plaintiff's Motion For Attorney's fees in *J. Paul Charlebois v. Angels Baseball*, 993 F. Supp.2d 1109, 1118 (C.D. Cal. 2012) (J. Carter), the Court approved of a billing rate of $695/hour for a case that took place 8-years ago in 2012 of the lead attorney in that case (DeSimone) who was admitted to the bar in 1985. In justifying Mr. Desimone's 2012 rate of $695/hour, the Court noted that in *Californians for Disability Rights v. Cal. DOT (Caltrans),* No. C 06-

L.; (E-Discovery Technology Project Manager); Purdy, William (E-Discovery Technology Project Manager); Davis, Jonathan (E-Discovery Technology Project Manager); Chew, Esther (E-Discovery Technology Project Manager); Yi, Christopher (E-Discovery Technology Project Manager); Eley, Rashan (E-Discovery Technology Data Coordinator); Munyer, Donna (E-Discovery Technology Specialist); Overby, Stephen H. (E-Discovery Technology Specialist); Gooding, James M. (E-Discovery Technology Specialist); Chow, Tommy (E-Discovery Technology Analyst); Morello, Robert (E-Discovery Technology Analyst); Berg, Eric C. (KM Research Lead); Pennebaker, Sarah (KM Research Analyst); Bono, Julie (KM Research Analyst); Dietz, Gina (Senior Research Analyst); Fisher, Heidi A. O. (Partner); Leinart, Jocelyn (Associate); Bruce, Rashanda (former Associate); Conrad B. Wilton (former Associate); Charles Nelson Keever (former Associate); and Imani Rasifu (former staff services).

DECLARATION OF JAMES E. DOROSHOW

113201626.v1

05125 SBA (MEJ), 2010 U.S. Dist. LEXIS 141030, *3 (N.D. Cal. Dec. 13, 2010), the Northern District found reasonable a rate of $730/hour for a 1985 law graduate, $660/hour and $650/hour for a 1991 and 1992 graduate respectively, $500/hour for an attorney with six years of experience, and $475/hour for a 5th year attorney. *Id.* Given that these were reasonable rates 10-years ago, I believe that my rate of $500/hour is also clearly reasonable in this case. *See Charlebois*, 993 F. Supp.2d at 1118; *Perfect 10, Inc. v. Giganews, Inc.,* 2015 WL 1746484 (C.D. Cal. March 24, 2015) (in awarding legal fees, finding reasonable in 2015 rates of $825 - $930/hour for senior partner with 29 years of experience, $610 - $750/hour for junior partners, $690/hour for senior associates, $350/hour for junior associates, $200/hour for a staff attorney, $100/hour for contract attorney, and $240 - $345/hour for paralegal time); *Pereira v. Ralph's Grocery Co.,* CV 07-841 PA(FFMX), 2010 WL 6510346, *1, 7 (C.D. Cal. July 1, 2010) (2010 case awarding attorneys' fees under ADA and CDPA and finding reasonable fee rates of $700/hour in class action settlement); *Elder v. Nat'l Conference of Bar Examiners,* C 11-00199 SI, 2011 WL 4079623, *1, 4 n.4 (N.D. Cal. Sept. 12, 2011) (2011 case awarding attorneys' fees under ADA and finding reasonable fee rates of $730/hour for a 1985 graduate, $640/hour for a 1993 graduate, $535/hour for a 2003 graduate).

50.     Moreover, these decisions are consistent with a 2017 Wolters Kluwer study that examined attorney rates by region and practice area in 2016, attached hereto as Exhibit M.  The Wolter Kluwer study reported that the mean billing rate in Los Angeles in 2016 was $660 for partners and $496 for associates.  *See* Real Rate Report Snap Shot 2017 at 19.  Again, considering that my current billing rate of $500/hour for this 2019-2020 case is substantially lower than the average partner billing rate in Los Angeles as of 2016 and essentially the same as that of an associate for that year, I believe that my billing rate is reasonable.

51.     The same can be said for my current and former partners who worked on this case.  Ashe Puri worked on this case from March 2019, when the Complaint was filed, until the end of March 2020, when he moved to another firm.  Puri started his legal

DECLARATION OF JAMES E. DOROSHOW

career as an associate at Ropes & Gray 2002, and he has been practicing law for 18-years. Mr. Puri's LinkedIn profile is attached as Exhibit N.

52.     After Mr. Puri left Fox Rothschild LLP, I asked my partner Howard Suh to assist in the case starting at the end of March 2020.   Mr. Suh started his legal career at Rogers & Wells (now Clifford Chance LLP) in 1996 and has thus practiced law for close to 25-years.  He has been counsel or partner at major law firms for close to 15-years. Mr. Suh's firm bio is attached hereto as Exhibit O.

53.     In June 2020, with 3-months left before trial and several upcoming deadlines before the scheduled July 27, 2020 Final Pretrial Conference, I also asked my partner Melissa Scott to assist with this case. Ms. Scott started as an attorney in 2004 at Cozen O'Connor, meaning that she has been practicing law for more than 15-years.  Ms. Scott was made Counsel at Fox Rothschild in May 2017 and was elevated to partner in May 2019.  Ms. Scott's firm bio is attached as Exhibit P.

54.     The billing rates of Mr. Puri and Mr. Suh are the same as mine in this case at $500/hour.  Ms. Scott has a billing rate of $430/hour.  I believe that these billing rates are reasonable since they are actually below the $660/hour average partner billing rate in Los Angeles as of 2016, according to the 2017 Wolter Kluwer study.  *See* Real Rate Report Snap Shot 2017 at 19.  These are also consistent or below the billing rates of similarly experienced attorneys where the court has awarded legal fees.  *See Caltrans,* No. C 06-05125 SBA (MEJ), 2010 U.S. Dist. LEXIS 141030, *3 ($660/hour and $650/hour for attorneys with 19 and 18 years of experience respectively, $500/hour for an attorney with six years of experience, and $475/hour for a 5th year attorney); *Perfect 10, Inc. v. Giganews, Inc.,* 2015 WL 1746484, *15-16 ($610 - $750/hour for junior partners and $690/hour for senior associates); *Elder*, 2011 WL 4079623, *1, 4 n.4  ($640/hour for attorney with 18 of years of experience and $535/hour for attorney with 8 years of experience).  Tina Wang was the main paralegal assigned to this case. Ms. Wang has been a paralegal at Fox Rothschild LLP since 2011, and before that, was a legal secretary for 10-years.  Her billing rate of $194/hour is also reasonable when compared to rates for

DECLARATION OF JAMES E. DOROSHOW

paralegals that have been approved in cases in the Central District of California where legal fees have been awarded. As the Court stated in *Perfect 10*, "[a]s long ago as 2008, for example, courts of this district repeatedly found paralegal rates regularly reached $250 in the Central District." 2011 WL 4079623 at *21 (in 2015, rates of $240/hour for a paralegal with five years' experience deemed reasonable); *Hirsch v. Compton Unified Sch. Dist.,* No. CV 12–01269 RSWL MRW, 2013 WL 1898553, at *3 (C.D. Cal. May 3, 2013) (finding paralegal rate of $200/hour reasonable and below the market rates of paralegals in the Central District); *Jones v. Corbis Corp.,* 2011 WL 4526084 (C.D. Cal. Aug. 24, 2011) (awarding paralegal rate of $243), *affd. mem.,* 2012 WL 2884790 (9th Cir. July 16, 2012); *Bernal v. Paradigm Talent & Literary Agency,* 2010 WL 6397561 (C.D. Cal. June 1, 2010) (awarding paralegal rate of $225); *Love v. The Mail on Sunday,* 2007 WL 2709975 at *8 (C.D. Cal. Sept. 7, 2007) (awarding paralegal rates of $245, $230 and $220), *affd. sub nom. Love v. Associated Newspapers, Ltd.,* 611 F.3d 601, 614–617 (9th Cir. 2010).

55.    A total of 1,491.60 hours were billed to Johnson on this case over the 17-months that this case was litigated, which averaged about 88 hours a month. Given the complexity of this case and P&P's litigation conduct (detailed above), I believe that these hours were reasonable. As these firm's billings reflect, Johnson was not overbilled for unnecessary work or subject to attorney "churning," but was provided with reasonable legal service.

56.    For example, for several months of this case, Johnson was billed less than 20 hours a month. April 2019 (8.5 hours); May 2019 (4.8 hours); August 2019 (9.5 hours); September 2019 (16.1 hours); October 2019 (5.5 hours). For those months in 2019 where the billed hours exceeded 20 hours, these involved months that were particularly heavy with discovery and/or early settlement efforts. June 2019 (48.8 hours involving drafting responsive pleading and interrogatories and document requests); July 2019 (36.9 hours largely spent preparing interrogatories, pretrial conference statement, and initial disclosures); November 2019 (38.8 hours involving settlement discussions with clients

DECLARATION OF JAMES E. DOROSHOW

and opposing side and preparing *Rule 30(b)(6)* deposition notice); December 2019 (51.3 hours billed towards drafting additional discovery and responding to P&P's discovery requests); and January 2020 (62.7 hours spent mainly responding to P&P's discovery requests).

57.     Starting in 2020, the level of work in the case intensified given the March 31, 2020 discovery cut-off period and August scheduled trial date. In January and February of this year, Johnson had to prepare, take and defend *Rule 30(b)(6)* depositions, all while attempting to complete document production and conducting a review of P&P's document production.  February 2020 (123 hours); March 2020 (115 hours).  Starting at the end of February 2020, Johnson began to evaluate whether this case could be decided on a summary judgement Motion.  Over the months of March through May, Johnson was billed for work that primarily involved drafting the summary judgment papers, as well as moving and opposing discovery motions, preparing for Mediation, and reviewing P&P's expert report from Wallace.  April 2020 (62.6 hours); May 2020 (69.9 hours); June 2020 (128 hours).  Johnson filed its Summary Judgment Motion on June 3, 2020, and in the months of June and July 2020, Johnson was billed for work mainly devoted to responding to P&P's Opposition to Johnson's Summary Judgment Motion, to prepare and take the deposition of P&P's expert Wallace, to prepare and file submissions for the Final Pretrial Conference, including filings and opposing six *Motions-in-Limine*, and to prepare demonstrative and graphics for the upcoming August 18, 2020 trial.  July (329 hours); August (379.10 hours).  Johnson was billed approximately 311 hours for work on the Summary Judgment papers (which included work replying to P&P's Opposition). Considering that Johnson's Summary Judgment Motion disposed of all of the issues in the case, and involved hundreds of pages of submissions, I believe that these hours were reasonable.

///

///

///

DECLARATION OF JAMES E. DOROSHOW

113201626.v1

58.    Finally, the costs billed to Johnson were clearly not excessive and well within what is reasonably expected from a typical trade dress infringement case like this. These costs mainly involved court filings, secretarial overtime, Westlaw research, photocopying, E-discovery costs, messenger services, and hotel and travel expenses. July 2019 ($139.57); August 2019 ($28.75), September 2019 ($363.53); December 2019 ($199.88); January 2020 ($53.67), February 2020 ($314.95); March 2020 ($2,216.87); April 2020 ($993.53); May 2020 ($823.32); June 2020 ($234.79); July 2020 ($367.16). An itemized breakdown of these costs is shown below:

July 2019 Invoice (for costs billed in in June 2020)

| Description | Amount |
| --- | --- |
| COURT FILINGS | $28.75 |
| SECRETARIAL OVERTIME | $84.56 |
| WESTLAW, RESEARCH | $26.26 |
|  |  |

August 2019 Invoice (for costs billed in July 2019)

| Description | Amount |
| --- | --- |
| COURT FILINGS | $28.75 |

September 2019 Invoice (for costs billed in August 2019)

| Description | Amount |
| --- | --- |
| FUND TRANSFER TO RETAINER/ESCROW | $0.00 |
| PHOTOCOPYING | $169.40 |
| PHOTOCOPYING - COLOR | $148.00 |
| SECRETARIAL OVERTIME | $46.13 |

DECLARATION OF JAMES E. DOROSHOW

113201626.v1

December 2019 Invoice (for costs billed in November 2019)

| Description | Amount |
|---|---|
| SECRETARIAL OVERTIME | $199.88 |

January 2020 Invoice (for costs billed in December 2019)

| Description | Amount |
|---|---|
| E-DISCOVERY COSTS | $53.67 |

February 2020 Invoice (for costs billed in January 2020)

| Description | Amount |
|---|---|
| MESSENGER SERVICE/DELIVERY | $29.75 |
| PHOTOCOPYING | $250.20 |
| PHOTOCOPYING - COLOR | $35.00 |

March 2020 Invoice (for costs billed in February 2020)

| Description | Amount |
|---|---|
| AIR - OUT-OF-TOWN TRAVEL EXPENSE | $18.00 |
| HOTEL - OUT-OF-TOWN TRAVEL EXPENSE | $386.32 |
| MEALS - OUT-OF-TOWN TRAVEL EXPENSE | $69.60 |
| MESSENGER SERVICE/FEDERAL EXPRESS | $19.72 |
| PHOTOCOPYING | $80.00 |
| PHOTOCOPYING - COLOR | $957.00 |
| SECRETARIAL OVERTIME | $553.93 |
| TAXI/UBER - LOCAL TRAVEL EXPENSE | $89.38 |
| TAXI/UBER - OUT-OF-TOWN TRAVEL EXPENSE | $42.92 |

37

DECLARATION OF JAMES E. DOROSHOW

113201626.v1

April 2020 Invoice (for costs billed in March 2020)

| Description | Amount |
|---|---|
| AIR - OUT-OF-TOWN TRAVEL EXPENSE | $833.40 |
| E-DISCOVERY COSTS | $29.81 |
| MESSENGER SERVICE/FEDERAL EXPRESS | $23.02 |
| PHOTOCOPYING | $3.00 |
| PHOTOCOPYING - COLOR | $69.00 |
| SECRETARIAL OVERTIME | $35.29 |

May 2020 Invoice (for costs billed in April 2020)

| Description | Amount |
|---|---|
| COURT FILINGS | $649.05 |
| MESSENGER SERVICE/DELIVERY | $29.75 |
| PHOTOCOPYING | $5.80 |
| PHOTOCOPYING - COLOR | $2.00 |
| SECRETARIAL OVERTIME | $137.22 |

June 2020 Invoice (for costs billed in May 2020)

| Description | Amount |
|---|---|
| SECRETARIAL OVERTIME | $234.79 |

July 2020 Invoice (for costs billed in June 2020)

| Description | Amount |
|---|---|
| PHOTOCOPYING | $44.60 |
| PHOTOCOPYING - COLOR | $8.00 |
| PUBLICATION/RESEARCH | $43.20 |
| SECRETARIAL OVERTIME | $271.36 |

DECLARATION OF JAMES E. DOROSHOW

113201626.v1

August 2020 PreBill (for costs billed in July 2020)

| Description | Amount |
|---|---|
| GOOD STANDING CERTIFICATE | $45.00 |
| WESTLAW, RESEARCH | $634.51 |
| E-DISCOVERY COSTS | $903.45 |
| MESSENGER SERVICE/DELIVERY | $69.00 |
| MESSENGER SERVICE/FEDERAL EXPRESS | $23.82 |

59.    On July 30, 2020, I conducted a meet and confer conference with P&P's counsel pursuant to this Court's Local Rules 7-3.  At that time, P&P's counsel informed me that P&P intended to oppose this Motion.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on this 12th day of August 2020, in Los Angeles, California.

/s/ James E. Doroshow
James E. Doroshow
Attorneys for Defendant JOHNSON
ENTERPRISES, LLC,
a Virginia limited liability company
DBA TAILGATING PROS

DECLARATION OF JAMES E. DOROSHOW

113201626.v1